Argued May 3, affirmed June 30, petition for rehearing denied
September 15, 1954

# HODGES AGENCY. INC. *v.* REES and STOVER
### 272 P. 2d 216

*C. C. Proebstel* and *B. D. Isaminger*, of Pendleton, argued the cause and filed a brief for appellant.

*Edward J. Clark* argued the cause for respondent. On the brief were Peterson, Clark & Peterson, of Pendleton.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN and TOOZE, Justices.

ROSSMAN, J.

This is an appeal by Harvey A. Stover, one of the two defendants, from a decree entered by the circuit court in favor of the other defendant, Harold G. Rees, which adjudged that Rees is the rightful owner of the promissory note which is the subject matter of this suit. The plaintiff, G. F. Hodges Agency, Inc., held the note in escrow. Its denomination is $5,000. Rees

was its maker and Stover is its payee. While the plaintiff was in possession of the note as escrow agent, Rees demanded its return and Stover made a counter demand for its delivery to him. At that juncture, the plaintiff, having impleaded the two rival claimants, participated no further in the suit. The circuit court ordered Rees to plead first. At the conclusion of the trial the court ordered the return of the note to its maker, Rees.

The aforementioned note was given by Rees May 8, 1951, a day after the plaintiff, Stover, Rees and the latter's brother had executed a paper known as an earnest money receipt whereby the Reeses undertook to purchase, and Stover to sell, a business located in Pendleton known as Pendleton Distributing Company. We will presently state the details.

Before the title instruments were prepared, an incident developed which the Reeses believed denied to them a part of the consideration for which they had bargained, and which caused them to contemplate the rescission of the transaction. Conferences then occurred which culminated in the execution by the parties on June 4, 1951, of an additional instrument which seemed to reconcile the misunderstandings. It pertained, in part, to the note.

The following are the assignments of error:

"Appellant assigns as error the holding of the court that the agreement on June 4, 1951 was given for a valuable consideration by the defendant Rees."

"Appellant assigns as error the court's admitting testimony tending to vary the terms of the written contract of May 7, 1951."

"The court was in error in holding that the defendant Rees was not the cause of the failure of performance of the contract of June 4, 1951

and was in error in entering a decree in favor of the defendant Rees and against the defendant Stover."

We will now state the circumstances which led to the giving of the note. For many years Stover had engaged in the business of distributing beer and other beverages in the counties of Morrow and Umatilla. His business was entitled Pendleton Distributing Company. He purchased beer wholesale from breweries and sold it to taverns and retailers. The beer in which he dealt had the brand names of Heidelberg, Bohemian and Miller. He also handled Columbia ale.

Heidelberg beer and Columbia ale are made by Columbia Breweries in Tacoma, Washington. Bohemian beer is produced in Spokane. The brewer of Miller beer maintains an office in Portland. Distributors, such as Stover, have no written agreement with the brewery which supplies them, nor do they have any contract, oral or otherwise, which assures them of any prescribed period in which they may handle the brewery's product. Distributorships may be terminated at any time and without notice.

May 2, 1951, Stover authorized the plaintiff, a broker, to sell the Pendleton Distributing Company for $45,000. The following day he notified the broker that he had increased the price to $50,000.

The defendant, Harold G. Rees, and his brother, Raymond E. Rees, in May of 1951, were engaged in farming. Neither had had any experience in the business of distributing beer or other beverages. When they heard that the Pendleton Distributing Company was for sale they were interested. The defendant, Harold G. Rees, in the subsequent negotiations for the purchase of the distributing enterprise, acted not only for himself but also for his brother. The latter

is not a party to this suit, and by the name Rees we shall constantly refer to the defendant, Harold G. Rees, and not to his brother.

Two or three days after Stover had authorized G. F. Hodges Agency, Inc., to sell his business, Rees and his brother decided to offer for it $45,000. Their offer contemplated that they would pay $15,000 at time of purchase, $15,000 more in one year and the remaining $15,000 in two years. Rees called upon the plaintiff and made the offer.

Immediately after Stover had authorized the plaintiff to sell the business he went to a hospital in Portland where he shortly underwent surgical treatment. May 7, 1951, Rees and G. F. Hodges, of the agency which bears that name, went to the hospital in Portland where Stover was awaiting surgery and presented to him Rees' offer. Before leaving Pendleton for Portland, Hodges had prepared a document known as an earnest money receipt in which the consideration was entered as $45,000, payable in the manner above mentioned. It provided that the business and all of its assets would be sold and conveyed to the Reeses. The paper was tendered to Stover for his acceptance and signature. At that point there occurred some bickering over the price, in the course of which Stover stated that he would not sell for less than $50,000. Presently Rees inquired whether Stover would be willing to accept Rees' note for $5,000 payable two years, seven months and 23 days hence, and bearing no interest. Stover answered in the affirmative. Thereupon it was agreed that the earnest money receipt should be signed and that, in addition to the $5,000 promised to Stover in that paper, he should also have Rees' $5,000 note. Having reached that agreement, the three men signed the earnest money receipt, each

in the appropriate place. At the same time Rees handed Hodges, in accordance with the demands of the earnest money receipt, Rees' check for $5,000. Concurrently Hodges wrote in longhand a note for $5,000 which Rees signed. Rees' brother did not sign the note and, since he had not authorized Rees to do so, he did not become a party to this suit. A couple of days later, when the earnest money receipt was presented to the brother in Pendleton, he signed it. The day after the meeting in the hospital Hodges secured a printed form of a note and, after writing in its blank spaces the proper entries, Rees signed it. It was substituted for the handwritten note which Rees signed the preceding day, and it happens in that way that it bears the date of May 8 while all the other papers are dated May 7. That note is the subject matter of this suit.

The earnest money receipt contains, among others, the following provisions:

"It is further understood that the seller hereof now has verbal agreements from the beverage manufacturers for the sale of their products in Umatilla and Morrow counties and the seller hereof will cause to be transferred all rights he now enjoys from the said manufacturers."

"It is agreed that if the seller does not approve the sale as herein above set forth or if he is not able to effect the transfer of the license and verbal agreements hereinabove mentioned or cannot within a period of 60 days deliver the assets as set forth, the earnest money herein receipted for shall be refunded, but if the above sale is approved by the seller and he is able to deliver the said assets as set forth herein and the purchasers neglect or refuse to compy [sic] with any of the * * *."

The above portrays the inception of the transaction which eventually yielded this appeal. As we

have signified, an unexpected episode occurred shortly after May 7 and before the papers essential to the completion of the transaction had been prepared. The episode was the transfer by the maker of Bohemian beer of its distributorship for Morrow and Umatilla counties to a competitor of Pendleton Distributing Company. The transfer was made a few days after the earnest money receipt was signed. The Reeses believed that the loss of the distributorship denied to them a part of the consideration for which they bargained when they undertook to purchase the Pendleton Distributing Company and threatened to rescind the transaction. Then some conferences occurred and eventually the paper, bearing date June 4, 1951, was signed by the parties. We shall now state the circumstances.

While the parties were in the hospital, Stover assured Rees that he would cooperate with him in his efforts to continue the business profitably. Stover recommended to Rees that he call upon the breweries which supplied Pendleton Distributing Company with beer, but added, according to Rees, that it would be unnecessary to call at once upon the producer of Bohemian beer. Rees swore that Stover told him that he had recently spoken to an official of the Bohemian brewery, whom he termed a friend of long standing, and had received promises that the distributorship of the Pendleton Distributing Company would be continued in the event of a sale unless the buyer, after a fair trial, proved himself incapable. According to Rees, Stover assured him, "Don't worry about Bohemian, I contacted them before I came down here, and they will go along with any sale that I make." Stover suggested to him, so Rees swore, that upon returning to Pendleton he should telephone to one

Harry Sleeth, the sales manager of Bohemian. Stover, as a witness, denied that he had mentioned particularly Bohemian and its sales manager, Sleeth. He, however, testified: "I had contacted all of my suppliers and they had agreed to go along with the new buyer until he proved or disproved himself * * *." When Rees and Hodges left the hospital in Portland they called upon the agency of Miller beer and then went to Tacoma where Rees presented himself to the producer of Heidelberg beer and Columbia ale.

May 14, after returning to Pendleton, Rees took charge of the Pendleton Distributing Company. In his management he retained Stover's father, who had conducted the business for a year or more during his son's illness. On the day when he assumed charge (May 14) Rees, according to his testimony, followed Stover's suggestion and sought to reach Sleeth upon the long distance telephone but discovered that he was temporarily absent from Spokane. The call was not completed until May 21. At that time Sleeth told him, so Rees swore, that he would be in Pendleton shortly. Two or three days after Rees' unsuccessful attempt of May 14 to speak to Sleeth upon the telephone, Bohemian's local representative, Harry Owens, called at the office of Pendleton Distributing Company and observed that a sale to the Reeses was under way. When he spoke to Rees he was told by the latter of the effort he had made to reach Sleeth on the long distance telephone. Rees also told Owens, as the latter acknowledged, that he would like to have the distributorship of Bohemian beer remain with the Pendleton Distributing Company. According to Owen, Rees made a poor impression upon him and he telephoned to Sleeth that he (Sleeth) should come to Pendleton.

About four days after Owens had come to Pendleton

Sleeth arrived. That was the seventh or eighth day after Rees had taken charge of the business. Before the two spoke to Rees they called upon the owners of a beer distributing concern located in Pendleton entitled Blue Mountain Distributing Company, and inquired whether that company was available as distributor for Bohemian beer. They received a favorable reply. We take the following from Sleeth's testimony:

"Q Did you see the Blue Mountain Distributing man?

"A I believe that I did.

"Q You went over and talked to him about his availability?

"A I think possibly that that is correct."

The morning following the conference with the owner of the Blue Mountain Distributing Company Sleeth and Owens called upon Rees. Presently they told him that Bohemian would supply him no further with its product. They awarded the distributorship to Blue Mountain Distributing Company.

When Rees discovered that Bohemian would no longer supply the Pendleton Distributing Company with beer he declared, "I don't want the business if I don't have Bohemian with it." He and Sleeth then repaired to Stover's home where more than one conference took place. Stover urged Sleeth to reconsider and even telephoned to the president of the Bohemian brewery. His efforts to dissuade Sleeth and retain the distributorship of Bohemian beer for the Pendleton Distributing Company were unsuccessful. At that point Rees announced a purpose to "throw it back into Harvey's lap." By Harvey he meant Stover. In taking that position, he asserted that the $5,000 note was in the nature of a guaranty fund and de-

pended upon the provision of the earnest money receipt quoted in a preceding paragraph, which follows:

"It is agreed that if the seller * * * is not able to effect the transfer of the license and verbal agreements hereinabove mentioned or cannot within a period of 60 days deliver the assets as set forth, the earnest money herein receipted for shall be refunded * * *."

█ Stover claims that the Reeses lost the Bohemian distributorship through their failure to pay proper heed to the wishes of Bohemian. He claims that Bohemian was dissatisfied with Rees because the latter removed a Bohemian sign from a large truck in which Pendleton Distributing Company brought beer from the breweries which it distributed, and also because Rees had not notified Bohemian promptly of his intended purchase.

As a witness in behalf of Stover, Sleeth mentioned Rees' removal of the sign and Rees' failure to notify Bohemian of the purchase before entering upon it.

The truck from which Rees removed the Bohemian sign was used by Pendleton Distributing Company in hauling from the Heidelberg and Bohemian breweries the beer which it sold. Since the volume of sales by the Pendleton Distributing Company of Heidelberg beer was almost double that of Bohemian beer, Rees believed that the truck should not carry the Bohemian sign. When the latter was removed, the truck was free from all signs. The evidence warrants a belief that Stover approved the removal of the sign. Sleeth did not attach controlling importance to Rees' act in removing the sign. He testified:

"Q * * * did you regard the removal of this sign as justifying your removal of the distributorship, is that right?

"A That in itself, I would not, no."

If the removal of the sign from the truck had been the cause of the trouble, the latter could have been solved by restoration of the sign.

It will be recalled that Stover notified Bohemian of his intention to sell the Pendleton Distributing Company and that Rees testified that Stover assured him that he would not have to notify Bohemian at once. We have mentioned the fact that Rees sought within a week after the earnest money receipt was signed to speak to Sleeth on the long distance telephone. It is apparent from the testimony of Owens and Sleeth that they became apprised of the impending transaction within a few days of its inception and before it was fully consummated. Sleeth testified:

"Q Had Harvey Stover phoned you and told you that he was listing the place because of ill health?

"A Yes.

"Q Did you tell him you would go along with his purchaser?

"A I told him I would definitely give the purchaser my consideration and that is all that I would ever tell anybody."

Although the evidence indicates that Sleeth may have been concerned over the fact that Rees removed the Bohemian sign from the truck and over Rees' failure to notify Bohemian before he signed the earnest money receipt, yet it indicates that other facts persuaded Sleeth to transfer the distributorship from the Pendleton to the Blue Mountain Distributing Company. Sleeth stated that "a multitude of things" influenced him when he made the transfer. Until about a year before the transaction between Stover and the Reeses, the Pendleton Distributing Company sold more Bohemian than Heidelberg beer. Then a change oc-

curred and Bohemian dropped into second place. The evidence seems to indicate that Bohemian, through a mischance in the brewing process, was for a short period the cause of its poor sale, but the fact remains that after it removed the cause Bohemian beer failed to regain its former position with the Pendleton Distributing Company. Such was the state of affairs when Stover sold to the Reeses. Stover was a personal friend of Sleeth and also of the president of Bohemian Brewing Company. His declining volume of sale of Bohemian beer took place during a period when he underwent a succession of operations. Those circumstances may account for the fact that the Bohemian Brewing Company did not discontinue the distributorship of Stover after he failed to regain for its product its former leadership and volume. But Bohemian's slump into second place undoubtedly gave Sleeth a strong urge to embrace the first opportunity which would present itself to improve the local distributorship. By so stating the situation, we make no implication that the transfer to Blue Mountain Distributing Company improved Bohemian's position. Sleeth's testimony indicates that he had devised for himself, as was natural, rules which guided him in selecting distributors for Bohemian beer. For example, he disfavored generally as distributor anyone who, in addition to handling Bohemian beer, represented another brewery which was also located in a western state. Next, he disapproved a distributor for whom Bohemian was of secondary importance. At the time he transferred Bohemian to Blue Mountain Distributing Company, Bohemian beer represented only 33 per cent of the sales of Pendleton Distributing Company, whereas Heidelberg was 57 per cent of its total. In the presence of influences of that consequence, we

believe that the removal of the sign from the truck and Rees' failure to speak immediately to Bohemian were not of major importance.

The foregoing indicates the difficulties in which Stover and Rees found themselves engrossed when Bohemian transferred the distributorship from the Pendleton to the Blue Mountain Distributing Company. When Rees saw that Bohemian had been lost and that Stover could not regain it, he told Stover, Sleeth and Hodges that he did not care to complete the purchase but intended to rescind the transaction. According to him, Hodges urged him not to do so, and added, "Maybe we could come to some deal"; that is, some modified form of the transaction. Going on, Rees testified that he "went on sitting there, waiting to see what would happen." About that time it occurred to Stover that he might be able to find some other brewery whose product would take the place of Bohemian beer. Referring to Rees by his Christian name of Harold, Stover testified:

> "My father had been talking to Harold, trying to get the deal to go all through and between my father and Mr. Hodges, Harold agreed that if we could get another beer or show within a certain period of time that the business would maintain its present volume, that he would continue to go through with the sale."

The above represents the state of affairs after Bohemian had transferred the distributorship of its product from the Pendleton to the Blue Mountain Distributing Company. It is clear that in that period Rees wished to rescind the transaction. To use his own words, he intended to "throw it back into Harvey's [Stover's] lap." Stover, in order to dissuade Rees from so doing, announced a purpose to find another

brand of beer which would take the place of Bohemian. The plaintiff, in order to prevent the sale from failing, urged Rees not to rescind, to be patient and to await a solution of the difficulties.

June 4 Stover and Rees met in the plaintiff's office and there came to an understanding which Hodges reduced to writing. A copy of the writing follows:

"THIS AGREEMENT entered into this 4th day of June, 1951, by and between Harold Rees, hereinafter known as the party of the first part, and Harvey Stover hereinafter known as the party of the second part.

"WITNESSETH: The said party of the second part has heretofore sold a business known as the Pendleton Distributing Company to the party of the first part, et al, and as a condition of the said sale there was a note dated May 8, 1951 for the amount of $5000.00, given to the party of the second part signed by the party of the first part as a part of the purchase price. Said note is now in the hands of the G. F. Hodges Agency, Inc. of Pendleton, Oregon. In the process of the sale of the aforementioned business a certain manufacturer withdrew his products which had previously been a part of the sales line. The party of the first part felt he was damaged by reason of this withdrawal. Now therefore, it is agreed between the parties hereto as follows:

"Both of the parties will make an effort to secure another line or lines of merchandise to compensate for the aforementioned line withdrawn, and if at the end of 60 days such line or lines of merchandise have been secured and the public acceptance and sales of said products indicate that their sales have, or will compensate for the line withdrawn, or if the sales of the present lines develop an aggregate business equal to or in excess of the business done by the Pendleton Distributing Company for the corresponding months for 1950, then and in that

event the said G. F. Hodges Agency, Inc. on the direction of the party of the first part shall surrender said note over to the party of the second part. However, if the parties hereto fail to secure such additional line or lines and the loss of the line hereinabove mentioned has not been compensated for, then and in that event the said G. F. Hodges Agency, Inc. shall turn back the said note to the party of the first part.

"The G. F. Hodges Agency, Inc. is hereby directed to hold said note for the period hereinabove mentioned.

"The execution of this agreement has no relation to the sales agreement now in existence between the parties hereto for the transfer of the assets of the Pendleton Distributing Company."

Rees swore that he would have rescinded the transaction of May 7 if the agreement of June 4 had not been effected.

On June 8, 1951, Stover executed the various papers whereby the business was transferred to the Reeses. They consisted in part of a bill of sale, a bulk sales affidavit and a notice of Stover's retirement from the business. Rees claims that he did not become owner until that day. Following June 4 Stover obtained the names of four California breweries and, at Rees' expense, sent them telegrams in an effort to secure for the Pendleton Distributing Company a substitute for Bohemian. The efforts were unsuccessful. However, it developed that a brand of ale known as Olde English ale was available for the Pendleton Distributing Company. The demand for ale, however, was minor and when Rees consulted Columbia Breweries he was told that it was opposed to his dealing in Olde English ale. That brewery reminded him that it produced Columbia ale which he distributed. Since the producer

of Bohemian beer had withdrawn that product from the Pendleton Distributing Company, Rees decided not to jeopardize his distributorship of Heidelberg beer and thereupon declined to accept Olde English ale. We do not believe that Stover criticizes Rees' decision. Through his personal efforts, Rees acquired the right to deal in his territory in the products of Canada Dry. Apart from the acquisition of that dealership, Pendleton Distributing Company gained no other beverage. It is clear that both Rees and Stover sought to obtain for it a satisfactory substitute for Bohemian. Undisputed figures compiled by an auditor show that the volume of business of the Pendleton Distributing Company after Bohemian withdrew its product has been substantially less than previously.

October 25, 1951, Stover wrote to Rees stating that he (Stover) was entitled to the note which is the subject matter of this suit. In his letter he stated:

"I found a suitable line of merchandise to compensate for any withdrawal of any lines mentioned in our agreement. * * * There is still the other matter that I feel that the aggregate business is equal to or in excess of the business done previously * * *."

The evidence warrants a finding that neither of those assertions was true. October 31, 1951, Rees' attorney answered Stover's letter by declaring:

"* * * such additional line or lines of merchandise had not been secured by you or Mr. Rees that indicates that the sales have, or will compensate for the line withdrawn. Also the sales of the present lines do not develop an aggregate business equal to or in excess of the business done by the Pendleton Distributing Company for the corresponding months for 1950."

The letter insisted that Rees was entitled to the return of his note. On the same day Rees demanded of the plaintiff the return of the note.

To avoid misconception of the issues, we add that Rees' pleadings do not charge that Stover was guilty of fraud or intentional deception in the sale of the Pendleton Distributing Company.

From the facts above reviewed, it is evident that a dispute and misunderstanding arose between Rees and Stover shortly after the earnest money receipt was signed. Their disagreement stemmed from the fact that, contrary to the expectations of the parties, Bohemian transferred the distributorship of its product from Pendleton Distributing Company to a competitor of the latter. When that occurred, Rees asserted, as we have seen, that he had a right to rescind the transaction. He cited the clause of the earnest money receipt which required Stover to deliver to him all assets within 60 days of the date of the receipt. He also claimed that it was understood when he signed the note for $5,000 that Stover would not be entitled to its delivery unless all assets were delivered to him (Rees) within the prescribed period. Stover, upon the other hand, argued that he actually transferred to the Reeses all assets when he gave Rees the keys to the place of business on May 7, and that the loss of the Bohemian account did not take place until after Rees had taken charge. Further, according to him, Rees himself was responsible for the lost distributorship. We have made this recapitulation for the purpose of taking note particularly of the fact that the signing of the earnest money receipt was succeeded by a bona fide dispute which centered in the meaning and application of that paper. We are satisfied that

all parties to the dispute, including the plaintiff, acted in good faith and were honest in their assertions. Rees, we believe, did not wish to abandon the purchase of the distributing concern, but felt that unless he and his brother received the Bohemian account, as well as all other assets, the business was not worth the consideration expressed in the earnest money receipt. He did not believe that the business became his until he received the bill of sale on June 8. Evidently, while the parties were engaged in their conflicting contentions, they were looking forward to a possible solution of them. Before long they reached the agreement represented by the paper which Hodges wrote and which they signed June 4. We proceed now directly to the first assignment of error.

It will be recalled that the agreement of June 4 stipulates that

> "if at the end of 60 days such line or lines of merchandise have been secured and the public acceptance and sales of said products indicate that their sales have, or will compensate for the line withdrawn, or if the sales of the present lines develop an aggregate business equal to or in excess of the business done by the Pendleton Distributing Company for the corresponding months for 1950,"

Stover should have the note; otherwise Rees.

In behalf of Stover's efforts to defeat the agreement of June 4, it is argued that Rees made no definite promise to forbear the institution of a suit for the rescission of the sale which is evidenced in the earnest money receipt. We think that Stover misconceives the nature of the agreement of June 4. The phraseology of that instrument does not display the technical nicety of a skilled scrivener, but the meaning is there and is discernible. The agreement was not primarily a

promise to forbear, but one of compromise. Because Bohemian had withdrawn from the Pendleton Distributing Company its product, Stover agreed to reduce to the extent of $5,000 the purchase price payable by Rees, if the parties could not secure within 60 days a satisfactory substitute product, or if the remaining beverages did not produce revenue equal to that previously received.

Stover claims that the agreement evidenced by the earnest money receipt conferred upon Rees no enforceable rights to deal in Bohemian beer and that, accordingly, the loss of that item gave him no right to rescind the agreement. Laying aside the rights of the parties, as a court would determine them, we look to the rules which govern consideration for compromise agreements. The following well chosen words of Mr. Justice Robert Bean, in *Smith v. Farra,* 21 Or 395, 28 P 241, 20 LRA 115, are apt:

"That there was an actual *bona fide* dispute between these parties as to the amount of plaintiff's damages, which each in good faith believed to be doubtful, and that the settlement was intended in good faith, as a compromise of such dispute, is not open to question on this record. But it is now insisted that the dispute was about a matter, not in fact doubtful, although the parties so considered it, and therefore the agreement of compromise is without consideration. The law favors voluntary settlements of controversies between the parties, which are characterized by good faith and a full disclosure of all the facts. (*Wells v. Neff,* 14 Or. 66.) And such settlements will be upheld and enforced, although the disposition made by the parties in their agreement may not be what the court would have adjudged, had the controversy been brought before it for decision; nor need the dispute to have been about a claim or matter actually doubtful. If

the parties *bona fide,* and on reasonable grounds, believed it to be doubtful, it is a sufficient consideration to support the compromise."

In that case, both of the parties had misconceived the rule of damages for breach of covenant and, in compromising, did so according to their untutored conception of their rights. They assumed that the measure of damages was the value at the time of the breach. In fact, the law was clear that the measure of damages was the consideration paid and interest upon it. The decision sustained the compromise, and the defendant was held liable to pay the agreed amount although it was greater than the paid consideration plus interest.

In *Butson v. Misz,* 81 Or 607, 160 P 530, a compromise was upheld as enforceable even though no valid claim underlay the compromise. The plaintiff had asserted a claim based upon a purported provision covering unpaid taxes in the mortgage which he held. Actually the mortgage contained no such provision. This court declared:

"A compromise and settlement of a *bona fide* controversy between the parties, where each having equal knowledge or equal means of knowledge of the facts in good faith claims a right in himself against the other, and which claim the parties consider good or doubtful, constitutes a valid binding agreement, and is a sufficient consideration to support a new contract, even though the law and facts were such that a court would not have adjudged such an adjustment: *Smith* v. *Farra,* 21 Or. 395 (28 Pac. 241, 20 L. R. A. 115); *Thayer* v. *Buchanan,* 46 Or. 106, 111 (79 Pac. 343); *Roane* v. *Union Pac. Life Ins. Co.,* 67 Or. 264 (135 Pac. 892); *McGlynn* v. *Scott,* 4 N. D. 18 (58 N. W. 460). A new contract based upon such a consideration will be enforced in equity: 2 Pom. Eq. Juris. (3 ed.), § 850."

Restatement of the Law, Contracts, § 76, says:

"Any consideration that is not a promise is sufficient to satisfy the requirement of § 19 (c), except the following:

\* \* \*

"(b) The surrender of, or forbearance to assert an invalid claim or defense by one who has not an honest and reasonable belief in its possible validity;

\* \* \*"

See, also, Williston on Contracts, Rev Ed, § 135.

If Rees had sought to rescind during the 60 days mentioned in the earnest money receipt, the agreement of June 4 would have been available to Stover as a defense requiring Rees to accept the return of the $5,000 note for the loss of Bohemian beer.

■ We believe that since Rees yielded his asserted right to rescind, and since that right was deemed by himself and Stover honestly and reasonably to be valid, the agreement of June 4 was based upon valid consideration. We find no merit in the first assignment of error and now proceed to the second.

■ We are in accord with Stover's contention that the testimony which we have reviewed cannot be used to vary the terms of the agreement which was effected May 7. That instrument must be construed to mean that the 60-day period referred only to the transfer of the equipment which constituted part of the assets of the Pendleton Distributing Company. However, the effect of the testimony was to show the belief of the parties that a claim existed. The rights of the parties in this suit are governed, not by the contract of May 7, but by the compromise agreement of June 4. *Young v. King,* 85 Or 22, 166 P 53. The reply filed

by Stover to the answer of Rees alleged absence of consideration for the compromise agreement. The testimony showing the belief of the parties that Rees had a right to rescind was properly admitted to reveal the consideration for the compromise agreement. We find no merit in the second assignment of error.

■ We come now to the third assignment of error. It is that the trial court erred in finding that Rees was not the cause of the failure of performance of the compromise agreement. The record amply supports the conclusion of the trial court that Stover demonstrated no power to obtain a substitute for the lost Bohemian beer, and that Rees' conduct was free from fault. The third assignment of error is lacking in merit.

The decree of the circuit court is affirmed.