Argued September 12, affirmed November 16, 1966

# WESTERN BANK *v.* MORRILL ET AL
## and
# BOICE and SHAW LUMBER MILL ET AL
### 420 P. 2d 119

48

*Edward M. Murphy,* Roseburg, argued the cause for appellant. With him on the brief were Stults, Jayne & Murphy, Roseburg.

*Frederic H. Starkweather, Jr.,* Gold Beach, argued the cause and filed the brief for respondents.

Before McALLISTER, Chief Justice, and PERRY, O'CONNELL, DENECKE and REDDING, Justices.

REDDING, J. (Pro Tempore).

This is an appeal by the defendant Dorothy Boice from what is termed a "decree" in a proceeding begun by a bill in interpleader by Western Bank against Robert M. Morrill and Mildred M. Morrill, his wife; Doris Hansen and Hans Hansen, her husband; Alora M. Tilley; Ray E. Shaw and Ralph H. Shaw, co-partners doing business as Shaw Lumber Mill; Frank S. Slover; and Dorothy Boice. The principal question, and the only one which we need decide, is whether defendant Dorothy Boice is bound by a written release not signed by her, but to which she agreed orally.

The matters in issue here arise out of a contract for the sale of timber entered into between the defendants. Defendants Robert M. Morrill, Doris Hansen and Dorothy Boice are brother and sisters; defendant Tilley is the widow of the predecessor in interest of said brother and said sisters and holds a dower interest in the real property upon which the timber was located. Frank S. Slover is assignee of some of the rights of the Shaws.

The beginning of the trouble between defendants Robert M. Morrill, Doris Hansen and Dorothy Boice came from their joint ownership of the property they inherited and they quarreled with each other to the extent that as the trial court found, they were for many years not on speaking terms to each other, and in particular, defendant Dorothy Boice, the present appellant, had not spoken to her twin sister, Doris Hansen, for several years. This condition continued

to the time of trial so that as a result, they, on many occasions, dealt through intermediaries and agents.

As a result of the inability of the brother and sisters to get along, a partition suit was instituted which concluded by each party taking certain portions of the real estate and the timber thereon in fee simple. At the time of the partition of the land, the parties to the partition suit agreed that the timber on the entire tract sought to be partitioned should be sold as a unit and the proceeds from the sale divided two-fifths to Robert M. Morrill and one-fifth each to Doris Hansen, Boice and Tilley. Pursuant to this agreement to sell the timber, the Hansens, Morrills, Boice and Tilley entered into an option agreement with the defendant Shaw Lumber Mill. The option which later became the contract under which the logging operation took place was, in part, as follows:

Robert M. Morrill and Mildred M. Morrill, Doris Hansen and Hans Hansen, Dorothy Boice, and Alora M. Tilley, the optionors, granted to the Shaw Lumber Mill, the optionee, its successors and assigns, "the sole and exclusive option to purchase upon the terms and conditions herein expressed, all of the merchantable Douglas Fir, White Fir, and Cedar timber, except dead Cedar, twelve (12) inches or greater DBH, down to an 8 inch top, * * *." (By DBH is meant "diameter breast high.")

In addition to the payment for the timber at specified rates per thousand, the agreement provided:

"* * * The Optionee also agrees to place in escrow $5,000.00 to guarantee completion of the timber harvest, * * *. Said deposit shall guarantee payment to Optionors, and shall be forfeited in the event Optionee * * * shall not complete performance of this agreement. In the event Optionee shall satisfactorily complete said performance and

make full payment hereunder, then said deposit shall be returned to him at the completion of his agreement. In addition to the above Optionee agrees to place $1.50 per thousand in escrow as timber is cut to guarantee performance and slash disposal."

This fund, at the time the interpleader suit was instituted by Western Bank, the escrowee, amounted to $19,795. The parties have in their briefs referred to this fund as "the liquidated damage fund" and the court will adopt that term in referring to said fund hereafter.

After providing that good forestry practices were to be observed in the removal of the timber, and that Manfred Martin, the mutual agent of the parties, should determine when logging was completed under the contract, the contract provided that "[t]itle to all lumber or logs cut or removed from said premises shall not pass until Optionors [sic] have paid in full therefore [sic]."

After modifications not here material, the option was exercised by the Shaw Lumber Mill and the option agreement was adopted as the final contract between the parties in 1959.

Under this agreement, the respondent Shaw Lumber Mill logged the area until May, 1964, when the logging operation was substantially completed. At the conclusion of the logging, a dispute arose which resulted in the litigation now before the court. Both Shaw Lumber Mill and the Hansens, Morrills, Boice and Tilley, laid claim to the liquidated damage fund. The defendants who owned this timber contended that defendant Shaw Lumber Mill had breached the contract in that it had conducted the logging operations in an improper manner and had thereby forfeited the

fund under the terms of the contract. Defendant Shaw Lumber Mill denied this and claimed it was entitled to the fund held in escrow by Western Bank.

Faced with these conflicting claims to the liquidated damage fund, and being unable to determine which of the two claimants was entitled thereto, Western Bank, on March 29, 1965, filed suit in interpleader and deposited the liquidated damage fund with the clerk of the court.

All of the defendants admitted the allegations of Western Bank's bill in interpleader and the court entered a decree discharging it from further participation in the case and ordered that the defendants interplead among themselves to determine who was entitled to the fund.

The defendants Hansen, Morrill, Boice and Tilley, by answer, which was verified by Dorothy Boice, claimed that Shaw Lumber Mill had breached the contract and had forfeited the liquidated damage fund. Shaw Lumber Mill, by reply, denied the breach, and by way of affirmative defense alleged that in December, 1964, the parties to the option agreement and timber sale contract entered into an agreement which, by its terms, "operated as a full and complete release of any and all actions, causes of action, claims and demands, including but not limited to those arising or growing out of said option or agreement between the parties as aforesaid." The Shaw Lumber Mill, by reply, further alleged:

"That said agreement was signed by the defendants Robert M. Morrill and Mildred M. Morrill, Doris Hansen and Hans Hansen, and Alora M. Tilley as members of said joint venture and that all the defendants who were signatories to said option agreement, including Robert M. Morrill and Mildred M. Morrill, Doris Hansen and Hans Han-

sen, Dorothy Boice and Alora M. Tilley, are bound thereby and that no cause of action or claim whatsoever, according to the terms of said release, may now be maintained by any of said defendants."

The release referred to in the reply of Shaw Lumber Mill provided that in exchange for mutual promises of release, the parties agreed that Western Bank should pay to the defendants Hansen, Morrill, Boice and Tilley, from the liquidated damage fund, the sum of $2,500 to be divided among them, and that the Bank pay the balance to respondent Shaw Lumber Mill.

The agreement shows upon its face that it was signed by all the parties to the timber sale contract, except appellant Dorothy Boice, who asserted on trial and asserts on appeal that she is not bound by the release. The Shaw partnership contends that Mrs. Boice is bound by her oral assent to the terms of the written release.

After the discharge of Western Bank from further participation in the case, and before trial of the issues between Shaw Lumber Mill on the one hand, and the remaining defendants on the other, all parties entered into an agreement to waive trial by jury on any and all questions of fact, and stipulated that the court determine all questions of fact and make findings thereof. Furthermore, at the suggestion of the court, the validity of the release agreement was isolated as the initial and controlling issue to be determined, since if it were determined that the release was binding upon all the parties, it would be determinative of the case and the issue of breach of contract and damages would be moot. The trial proceeded on this basis.

At the end of the trial, the court made its findings of fact and conclusions of law. The court concluded

that the release agreement was a valid and binding instrument and entitled to be enforced, that it was "agreed to in writing by the signers thereof and agreed to orally by defendant Dorothy Boice, and that all are estopped to deny the agreement of release and compromise."

Judgment and decree was entered awarding $2,500 to defendants Morrills, Hansens, Tilley and Boice, and the balance of the liquidated damage fund to the Shaw partnership. Only Dorothy Boice has appealed. As both parties to this appeal were defendants in the interpleader suit, defendant Dorothy Boice, the only defendant who has appealed, will hereafter be referred to as appellant, and the defendant Shaw Lumber Mill will be referred to as respondent.

Before proceeding to decide whether appellant Dorothy Boice is bound by the release not signed by her, but to which she agreed orally, it will be helpful to review with more particularity the facts relating to the release as found by the trial court to exist.

It appears that appellant Dorothy Boice was the more active of the timber owners to the contract, and was the primary party with whom respondent Shaw Lumber Mill dealt. The Shaws, therefore, first negotiated with Mrs. Boice with a view to settling the dispute. An agreement was reached. There is evidence that Mrs. Boice, herself, participated in the determination of the terms of the settlement and agreed to be bound thereby, and directed Ray E. Shaw to submit to her a writing in accordance with their discussions.

Shortly after the discussion of the terms of the proposed release by Shaw and Boice, Ray E. Shaw submitted to Boice a writing conforming in all respects to the oral agreement. At that time she read the agreement and again affirmed her assent to its terms. She

refused, however, to sign the agreement at that time and insisted that Shaw first obtain the signature of her sister, Doris Hansen, ageeing that she would then sign the agreement.

Ray E. Shaw obtained the assent to the release of the Morrills and Alora M. Tilley, who all executed the release agreement. He then took the release to the home of Doris and Hans Hansen for their assent and execution. At this time, Doris Hansen refused to sign without first consulting with Manfred Martin. Shaw thereupon went to the home of Manfred Martin and brought him to the Hansen residence. Martin recommended that the Hansens sign the release. Because of the distrust which existed between Mrs. Hansen and Dorothy Boice, Mrs. Hansen still refused to sign unless Dorothy Boice would reaffirm her promise to sign. Thereupon, defendant Hans Hansen, in the presence of Manfred Martin and defendants Doris Hansen and Ray E. Shaw, placed a telephone call to the home of defendant Dorothy Boice and talked to her son Gary Boice who acted on occasion as Mrs. Boice's agent in regard to the transaction of business between her and her family, as the trial court found. Dorothy Boice was present in her home during said telephone conversation between Gary Boice and Hans Hansen. She heard the conversation and knew that it concerned the compromise and release. In that conversation, Gary Boice confirmed to defendant Hans Hansen that his mother had agreed to the release and would sign it. Hans Hansen so informed Manfred Martin and defendants Doris Hansen and Ray E. Shaw. Hans Hansen then signed the compromise and release without reservation. Nevertheless, Doris Hansen continued to express fear that she would not get her share of the settlement, fearing Boice would keep

it or refuse to pay it to her. She thereupon drove a separate bargain as to her share of the settlement, amounting to $500, whereby respondent guaranteed the payment to her of $500, and this indemnity agreement was reduced to writing and was signed by Ray E. Shaw, the Hansens and by Manfred Martin. Thereupon Doris Hansen signed the compromise and release agreement without reservation or condition.

Dorothy Boice subsequently refused to sign the agreement.

Mrs. Boice admitted having agreed to the release; it is her contention, however, that she is not bound because she later refused to sign it. The appellant makes no contention that the release agreement is required by statute to be in writing, signed by the party sought to be charged. Indeed, no such contention could be successfully maintained.

■ The law is clear that in the absence of a statute requiring an agreement to be in writing signed by the party to be charged, parties may become bound by the terms of a written contract, though they do not sign it, where their assent is otherwise indicated. 17 Am Jur 2d, Contracts § 70.

■ The above rule is not limited in its application to any specific area of contract law, but is one of general application. *Nelkin v. Marvin Hime & Co.*, 228 Cal App2d 744, 39 Cal Rptr 701 (1964) ; *Albright v. Stegeman M.C. Co.*, 168 Wis 557, 170 NW 951, 19 ALR 463 (1919).

■ The fact that one or some of the parties to a written contract affix their signatures thereto does not necessarily require all to do so. "A written contract, not required to be in writing, is valid if one of the parties signs it and the other acquiesces therein." 17 Am Jur 2d, Contracts § 70. Though a signature is more

concrete evidence of assent than is assent manifested orally or by conduct, that fact goes to the weight, not the sufficiency, of the proof. There was ample evidence in the testimony, both by Ray Shaw and by Dorothy Boice, in response to cross-examination, to substantiate the trial court's finding that Dorothy Boice agreed to the terms of the release. Following is the sole question put to Dorothy Boice on cross-examination:

Mr. Starkweather: "Q Is it your testimony you never told Mr. Shaw you would sign this if your sister did?"
Dorothy Boice: "A No."

We conclude, as did the trial court, as shown by its findings of fact, that through negotiation, Ray E. Shaw and Dorothy Boice reached an agreement of settlement and release, and at the suggestion of Boice, Shaw caused all the terms of the settlement and release agreement to be reduced to writing, and that the writing was submitted to Boice for her approval and that she did in fact accept at that time all its terms.

■ It may be urged that the assent of Boice was conditional in that she refused to sign until her sister, Doris Hansen, had signed. In this regard, it is sufficient to say that at no time prior to the signing by Mrs. Hansen did appellant Boice withdraw her assent, and the condition precedent to her promise to sign had occurred rendering her promise to sign absolute. The consideration for the promise was the counter promise of the respondent Shaw Lumber Mill to make the payment prescribed in the release of the disputed claim. *Hodges Agency, Inc. v. Rees and Stover,* 202 Or 139, 272 P2d 216 (1954); *Hirsch v. May,* 75 Or 403, 146 P 831 (1915).

Thus this case may be viewed in one of two ways,

and in both, the same result follows. It may be considered that by expressing her assent to all of the terms of the written agreement, after reading it, Dorothy Boice became bound to its terms, her signature not being a condition precedent to her legal obligation once Doris Hansen had signed; *Smith v. Onyx Oil and Chemical Company,* 218 F2d 104, 50 ALR2d 216 (3rd Cir 1955); or, it may considered that Boice's promise was a promise to sign a written contract, the terms of which were known to her and acquiesced in expressly, once Doris Hansen had signed.

 As stated in 17 CJS 699-702, Contracts § 49:

"* * * an agreement to make and execute a certain written agreement, the terms of which are mutually understood and agreed on, is in all respects as valid and obligatory as the written contract itself would be if executed. If therefore it appears that the minds of the parties have met, that a proposition for a contract has been made by one party and accepted by the other, that the terms of this contract are in all respects definitely understood and agreed on, * * * this is an obligatory agreement, which dates from the making of the oral agreement and not from the date of the subsequent writing, * * *.

"* * * An action at law will lie for the breach of the oral contract to execute the written agreement, and the same damages are recoverable as would have been recoverable for a refusal to perform the contract had it been executed in writing."

See also *Indian Refining Co. v. McCombs,* 47 Ohio App 425, 191 NE 919 (1933).

 In either view, appellant had agreed to the release which, as the trial court concluded, was valid and entitled to be enforced as to appellant as well as to the signatories thereto. Even if Boice's assent was conditioned upon her own signature (which does not ap-

pear to be the case), and if she promised to sign if her sister, Doris Hansen, signed, then when Hansen did in fact sign, Boice's duty to do so also was a present one and her failure to sign is actionable and the damages are the same as though she had executed the document as promised.

■ These propositions are supported by decisions of this court. If a written contract is intended merely to serve the purpose of a memorial of a completed contract already made, the failure to execute the writing does not prevent the existing agreement from binding the parties. *Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 213 P2d 177, 215 P2d 380 (1949); *Williams v. Burdick*, 63 Or 41, 125 P 844, 126 P 603 (1912).

This court has never had occasion to apply the rules herein announced to contracts of release or compromise. However, in those jurisdictions where the issues have been before the court in the form here presented, the result has been uniform where the evidence shows that the terms of the contract of settlement were fully and definitely agreed upon, notwithstanding the fact that the agreement was to be reduced to writing and signed by the parties.

In *Arkansas Anthracite Coal & Land Co. v. Dunlap*, 142 Ark 358, 218 SW 839 (1920) a dispute arose between the parties to a written contract which provided for payment of royalties to Dunlap on coal mined from his land. Dunlap brought action against the coal company upon an alleged oral contract between the parties for settlement of the dispute by the payment of the sum of $1,000 to Dunlap in full settlement of the disputed claim.

Upon conflicting evidence, the trial jury found that an oral contract had been entered into and returned

a verdict for plaintiff, Dunlap. Upon appeal by Coal Co., the appellate court, in affirming the judgment entered on the verdict, held:

"* * * The settlement of the disputed claim constituted a consideration for the agreement, and there was mutuality in the alleged agreement to settle according to the new terms stated.

"* * * The testimony adduced by appellees tended to show that the terms of the contract of settlement were fully and definitely agreed upon, notwithstanding the fact that the agreement was to be reduced to writing and signed by the parties, * * *.

"* * * If, as stated by the witnesses introduced by appellees, there was a completed oral agreement, the parties were bound by it, even though it was to be reduced to writing. Friedman v. Schleuter, 105 Ark. 580." 142 Ark at 361.

Also see *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*, 298 F2d 801 (3rd Cir), cert. denied 370 US 939, 82 S Ct 1585, 8 L ed2d 807 (1962); *Dominguez Estate Co. v. Los Angeles Turf Club*, 119 Cal App2d 530, 259 P2d 962 (1953).

■ This appeal arises out of a matter brought before the court originally as a suit in interpleader. While interpleader is equitable in nature, once the equitable issue of the right of the plaintiff to implead the adverse claimants and to be discharged is determined, the contest as to which of the claimants is entitled to the fund in court may be either legal or equitable in nature, depending upon the issues to be decided. Here, the issues remaining in the case after the discharge of Western Bank were legal, i.e., breach of contract, damages, and release. The parties waived their right to a jury trial and submitted the determination of the issues of fact to the trial judge. This court,

in *Reif v. Botz,* 241 Or 489, 491, 406 P2d 907 (1965) held:

> "Since the findings of a trial judge sitting as a trier of the facts in an action at law are entitled to the same finality as the verdict of a jury, his findings must be sustained if there is any evidence in the record to support them. * * *"

The trial court, at the termination of the within case, stated:

> "An order will be entered upon this judgment, or I should say, 'decree', since I have taken upon myself to exercise equitable jurisdiction * * *."

 While in actions at law, the final order of the court is ordinarily denominated a "judgment", it is believed that the use of the term "decree" is not controlling where the issues are clearly legal. The state of the record on the question of whether the case was tried at law or in equity is not clear. We conclude from an examination of the issues that the matter should more properly have been tried as an action at law, and that we should here measure the evidence against the standard applicable in such cases. It should be noted appellant voiced no objection to the case being so tried when the trial court sought and obtained a stipulation from the parties that the court try the matter without the intervention of a jury.

Judgment affirmed.