**In re GATLINBURG MOTEL ENTER-PRISES, d.b.a. Glenstone Lodge, Debtor.**

**John P. NEWTON Jr., Trustee, Plaintiff,**

v.

**George GIBALSKI, Defendant.**

**Bankruptcy No. 87–00708. Adv. No. 90–3131.**

United States Bankruptcy Court, E.D. Tennessee.

April 16, 1991.

Daniel F. McGehee, Knoxville, Tenn., for plaintiff.

Michael H. Fitzpatrick, Knoxville, Tenn., for defendant.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

This is an action in which the trustee seeks damages from the defendant arising from the defendant's alleged breach of a real estate sales contract. The parties have agreed the court may enter a final judgment in this proceeding subject to appellate review under 28 U.S.C.A. § 158 (West Supp.1990). The following constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### I.

1. On March 23, 1987, Gatlinburg Motel Enterprises, Ltd., filed a petition for relief in this court pursuant to the provisions of chapter 11 of the Bankruptcy Code. The case was later converted to a case under the provisions of chapter 7 and the plaintiff was appointed chapter 7 trustee.

2. The principal business of the debtor was the operation of the Glenstone Lodge, a motel in Gatlinburg, Tennessee. The debtor held a long-term lease on the motel and owned certain personal property connected with the motel operation. Also, the debtor possessed certain leases of equipment, carpet, and wallpaper, which all related to the motel operation.

3. Sevier County Bank held a first mortgage on the debtor's principal assets. During the course of the bankruptcy case, a second mortgage held by Marvin J. Herskowitz, Trustee, was avoided with the lien being preserved for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551 (West 1979).

4. On two separate occasions the trustee entered into contracts with potential purchasers of the debtor's interest in the Glenstone Lodge. On both occasions the contracts contained financing contingencies which were not satisfied by the potential purchasers and thus the contracts were not consummated.

5. The defendant, George Gibalski, a Miami businessman who holds a ninth grade education but who has bought and sold at least 30 hotels or motels during the 27 years he has been in the hotel-motel business, became interested in the purchase of the Glenstone Lodge when he was contacted by his real estate agent, Bob Hilton, in early November 1989.

6. Subsequently, Bob Hilton and his associate, Suzann Vaughan, met with the trustee on November 16, 1989, for the purpose of discussing the purchase of the debtor's interest in Glenstone Lodge by Gibalski. At that meeting Hilton and Vaughan presented the trustee with a document executed by Gibalski giving Hilton and Vaughan the power of attorney to purchase the Glenstone Lodge on behalf of Gibalski. Hilton and Vaughan also gave the trustee a letter from Gibalski dated November 14, 1989, which reads as follows:

Please find enclosed the Power of Attorney letter, Property Information Sheet and Letter of Credit.

The Letter of credit reflects seventeen million dollars in Securities. Ten million dollars have already been allocated towards the purchase of the Plaza Dorada and Casino. The balance of seven million dollars is available for other purposes.

If you need any additional information, please feel free to contact me personally.

7. The property information sheet reflected that Gibalski owned four hotel or motel properties with a total equity value of $36,300,000. The so-called letter of credit referred to in Gibalski's letter to the trustee is dated October 18, 1989, is addressed to Gibalski from Louis P. Mirando, president of Columbia Security and Transfer, Inc. and reads as follows:

Upon receipt of your 3% commitment fee, we are ready willing and able to open up an account in your name at a prominent security bond house listed in Standard & Poor, and we will deposit in excess of $17,000,000.00 (U.S.D.) GNMA.

These securities will be free and clear of any liens or encumbrances and will be at your disposal to give an assignment on these U.S. government backed securities to pledge to secure the purchase of The Plaza Dorada Hotel and Casino, Porta Playa, Dominican Republic.

The securities will be available upon an agreed upon declining balance for up to 21 years and may be down no later than November 17, 1989.

Upon payment of all our fees, we will open a joint account in your name and the brokerage house will confirm to you under a Schedule "A" all the pertinent information regarding the GNMA in the account, including the pool and cusip numbers which will enable any bank or financial institution to verify the GNMA.

8. During the meeting with the trustee on November 16, 1989, Hilton and Vaughan were furnished a blank contract for the sale of the debtor's interests in the Glenstone Lodge. They left the meeting with the contract so that it could be examined by their attorney, Harold Stone. Stone called the trustee and asked several questions about the contract. Shortly thereafter, Hilton and Vaughan returned with the contract. The blanks in the contract were filled in and the contract was signed

on George Gibalski's behalf by Hilton and Vaughan.

9. Under the terms of the contract, the purchase price for the debtor's interests in Glenstone Lodge was $4,840,000 and the closing date for the sale was set to occur no later than January 5, 1990, [the contract actually stated the closing was to occur no later than January 5, 1989, an obvious typographical error].

10. The contract contained no financing contingency, but it did contemplate the payment of an earnest money deposit in the amount of $100,000. In this regard, the contract reads in pertinent part as follows:

2. At the time of the execution of this agreement, Buyer has paid Newton a deposit of $100,000.00 which shall be refundable to Buyer only in the event that (a) this transaction is not approved by the Bankruptcy Court, (b) Newton is unable to assume the Lease pursuant to 11 U.S.C. § 365, or (c) Newton is unable to close because of any applicable stays, as referenced in paragraph 8 hereof.

11. The trustee did not immediately execute the contract, but rather faxed a copy of the contract executed by Hilton and Vaughan to Gibalski on November 17, 1989. The facsimile transmittal contained wiring instructions so that Gibalski could wire the $100,000 earnest money deposit to the trustee's account. The funds, however, were not sent.

12. At some point, the trustee also executed the contract signed by Hilton and Vaughan although it is not known when the trustee actually placed his signature on the document.

13. Before seeking approval of the contract from the bankruptcy court, the trustee wanted Gibalski's signature on the contract and he wanted to obtain the $100,000 deposit.

14. Sometime after November 17, 1989, Gibalski traveled to Tennessee and inspected the Glenstone Lodge. He then met with the trustee and the trustee's attorney, Morris Kizer. Also present at the meeting were Hilton and Vaughan. A new contract was typed up at Gibalski's request that made certain changes in the agreement.

Those changes were as follows: (1) the first agreement provided the agreement was made between the trustee and Gibalski; the new agreement provided the agreement was made between the trustee and Gibalski or his assigns; (2) the new agreement corrected a typographical error contained in numbered paragraph 3 of the first agreement; (3) the first agreement provided that subject to the approval of the bankruptcy court, the sale of assets would be free and clear of all liens and encumbrances except 1989 real and personal property taxes which would be prorated as of the closing date; the new agreement contained a similar provision except that the referenced taxes were 1990 real and personal property taxes; (4) the first agreement stated that the closing date for the sale would be no later than January 5, 1989; the new agreement changed the day of closing to no later than January 31 and corrected the typographical error in the year from 1989 to 1990; (5) the first agreement obligated the buyer to attend a hearing on the trustee's motion to assume the lease which was to be scheduled by the bankruptcy court on a mutually convenient date; the new agreement deleted any reference to a mutually convenient date making it clear that the buyer was obligated to attend the hearing even if it were not convenient; (6) the first agreement stated that the trustee was currently holding deposits on advanced bookings in the amount of $20,418.88; the new agreement provided the $20,418.88 in deposits were as of November 15, 1989; and (7) the first agreement's signature line for the buyer reflected the names of Robert Hilton and Suzann Vaughan, Gibalski's attorneys in fact; the new agreement's signature line for the buyer reflected only Gibalski's name.

15. It was made clear to Gibalski during the meeting that the sales contract contained no financing contingency. Gibalski expected his financing to be approved and he told the trustee that he did not anticipate any problem with his financing.

16. Although the trustee had expected to receive the $100,000 in earnest money

that day, Gibalski did not have the money with him. Gibalski told the trustee he wanted his attorney to look over this latest agreement before he signed it. The trustee signed the contract and gave it to Gibalski so that he could take it to his attorney. Gibalski left the meeting with the contract.

17. Gibalski never showed the latest contract to his attorney. On December 21, 1989, Hilton called Gibalski and told him if he wanted to buy the property he had to immediately execute the contract and return it to the trustee. Hilton told Gibalski the trustee needed to present the contract to the court for court approval of the sale. Gibalski then executed the contract and faxed a copy to the trustee. The original contract was sent by overnight delivery to Morris Kizer who received it on December 22, 1989. Although once again the terms in the second contract state that "[a]t the time of the execution of this agreement, the Buyer has paid Newton a deposit of $100,000," the earnest money deposit was not sent with the executed contract. Gibalski testified he did not send the money because his financing had not yet been approved.

18. When the trustee saw that Gibalski had not sent his earnest money deposit with the executed contract, he faxed a copy of the contract to Gibalski on December 22, 1989, and requested the $100,000 by wire to his bank. The trustee also had a number of telephonic conversations with Gibalski concerning the earnest money deposit. Gibalski told the trustee his financing was not yet in place and he did not want to send the $100,000 to the trustee because he was afraid he would lose the earnest money if he did not get the financing.

19. Despite efforts to obtain financing, Gibalski did not succeed in getting financing for the purchase of the motel by the closing deadline nor did he ever tender the $100,000 deposit or the purchase price to the trustee.

20. The debtor's interests in Glenstone Lodge were later foreclosed by the first lienholder, Sevier County Bank, on March 30, 1990. The bank sold the real estate lease to a third party for $3,405,000 and the personal property for $50,000.

21. The trustee's damages for the alleged breach of contract total $1,385,000, the difference between the price contained in the Gibalski contract and the price received at the foreclosure sale.

II.

The trustee contends the defendant breached the agreement dated December 21, 1989, in which Gibalski allegedly agreed to purchase assets of Gatlinburg Motel Enterprises, Ltd. including the Glenstone Lodge leasehold estate and certain personal property. The trustee seeks damages in the amount of $1,385,000 plus prejudgment interest. The defendant contends he never entered into a contract with the plaintiff and denies the plaintiff is entitled to damages.

The principal issue in this case is whether a contract existed between the plaintiff and the defendant. "A contract is simply an agreement between two parties, based on adequate consideration, to do or not to do a particular thing." *Bill Walker & Assoc. v. Parrish,* 770 S.W.2d 764, 770 (Tenn.Ct.App.1989) (citing *Johnson v. Central Nat'l Ins. Co.,* 210 Tenn. 24, 34, 356 S.W.2d 277, 281 (1962)). "[T]he character of a transaction is to be determined by the intention of the parties as gathered from the entire contract, the surrounding circumstances and the conduct of the parties." *Alley v. Thompson,* 28 Tenn.App. 45, 185 S.W.2d 910 (Tenn.Ct.App.1944).

When Gibalski and the trustee met for purposes of discussing the Glenstone Lodge sale and drafting the new sale contract, the parties discussed the fact that the contract was not subject to a financing contingency. Gibalski thought his financing was going to be approved and he told the trustee he was confident he would be able to obtain the moneys for the sale. His excuse for not signing the contract at the meeting with the trustee was that he wanted his attorney to look over the agreement one last time.

On December 21, 1989, Hilton called Gibalski and told him if he wanted to buy the

property he had to immediately execute the contract and return it to the trustee. Gibalski communicated his assent to the agreement when he signed it and returned it to the trustee. *See Ron Kirby Auction & Realty v. Arney,* No. 89–332–II, 1990 WL 91141 (Tenn.Ct.App. July 5, 1990) ("Affixing a signature to a contract is a common mode of communicating assent.") (citing *Western Bank v. Morrill,* 245 Or. 47, 420 P.2d 119, 124 (Or.1966); *McCullough v. Kirby,* 204 Ga. 738, 51 S.E.2d 812, 816 (Ga.1949)). Gibalski failed, however, to send the $100,000 deposit, the receipt of which was acknowledged in the contract. The question thus becomes whether the payment of the deposit was a condition of acceptance.

In *Hewitt v. Hutter,* 406 F.Supp. 976, 983 n. 6 (W.D.Va.1975), a district court, applying Virginia law, had before it a real estate contract which contained the following provision designated paragraph 20: "It is understood and agreed that Seller has executed this contract in advance and it shall constitute an offer to sell until such time as it has been accepted by the Buyer by their execution hereof and returned to Seller along with a certified or cashier's check in the amount of Ninety Five Thousand Dollars ($95,000.00) representing the deposit hereinbefore mentioned." The buyer argued, *inter alia,* that acceptance of the contract required both that the buyer execute the contract and return the contract to the seller with the $95,000 deposit. The district court disagreed. The court reasoned as follows:

> The payment of $95,000.00 was an obligation of buyers under the contract apart from acceptance. The payment even by paragraph 20 terms constituted a deposit. The deposit possesses its own importance. It represents buyers' good faith in entering into the transaction and is to be treated as liquidated damages in the event of non-performance by buyers. It can by no means be said that payment of the deposit is clearly and unequivocally a part of the acceptance of this contract by buyers. Paragraph 20 could be construed to say that acceptance is attained by buyers' execution of the Con-

tract for Sale, after which it will then be returned to sellers with the check representing the deposit. This construction (to the extent that payment of the deposit is not part of the acceptance procedure) is supported by the language of paragraph 2, wherein sellers acknowledged receipt of the $95,000.00 when they signed the Contract for Sale on March 1, 1974. Such language implies payment of the deposit prior to acceptance by buyers. Thus the terms of paragraph 2 and paragraph 20 seem inconsistent. If the meaning of the contract is *not* clear and unequivocal, the court is at liberty to depart from the express terms of the contract taken out of context and to study the true meaning of those terms as they relate to the entire instrument. *Nelson & Co. v. Development Corp.,* 207 Va. 386, 389, 150 S.E.2d 142 (1966). Therefore, this court construes the requirement of buyers to tender a check for $95,000.00 to sellers as one of independent significance, separate from the buyers' manner of acceptance. The withholding of that payment constitutes a breach of the contract, not a failure to accept it.

*Hewitt v. Hutter,* 406 F.Supp. at 983, 984.

■ In the instant case, the contract provides that "[a]t the time of the execution of this agreement, Buyer has paid Newton a deposit of $100,000.00 . . . ." This provision is similar to the contractual provision mentioned by the *Hewitt* court wherein the sellers acknowledged receipt of the deposit at the time they signed the contract. This court concludes, as the *Hewitt* court did, that the provision pertaining to the deposit implies that the deposit has already been paid prior to the acceptance by the buyer. The terms of the contract did not make the $100,000 deposit a condition of acceptance. In the words of the *Hewitt* court, the requirement that the buyer tender the deposit to the seller is "one of independent significance, separate from the [buyer's] manner of acceptance." *Id.* at 984. Gibalski's obligation to tender the $100,000 deposit was a part of his duty to perform under the contract. *See Hill v. Goodwin,* 722 S.W.2d

668, 672 (Tenn.Ct.App.1986) (where contract provided that deposit was to be paid "with execution of this contract," court stated that failure to make the down payment would amount to a material breach).

The defendant's second line of defense questions the validity of the second contract executed by Gibalski. The defendant argues that since the agreement executed by Gibalski in December, 1989, contained the same terms as the agreement executed by Suzann Vaughan and Bob Hilton in November, 1989, it would not be binding absent additional consideration.

■ "[P]arties to any contract, if they continue interested and act upon a sufficient consideration while it remains executory, may by a new and later agreement rescind it in whole or in part, alter or modify it in any respect, add to or supplement it, or replace it by a substitute." 17A Am.Jur.2d *Contracts* § 513 (1991). "The ordinary rule in contractual matters is that the last agreement as to the same subject matter which is signed by all parties supersedes all former agreements and the last contract is the one which embodies the true agreement." *Bringhurst v. Tual*, 598 S.W.2d 620, 622 (Tenn.Ct.App.1980) (citing *American Fruit Growers v. Hawkinson*, 21 Tenn.App. 127, 106 S.W.2d 564, 568 (Tenn.Ct.App.1937). Upon execution by the parties of a valid and legal substituted agreement, the original agreement merges into it and is extinguished. 17A Am.Jur.2d *Contracts* § 513 (1991).

■ The agreement executed in December was intended by the parties to be a substituted agreement for the one executed previously. Although the changes in the new contract were minor, they were nevertheless changes supported by sufficient consideration. To constitute consideration, "any benefit to one party and/or detriment to the other may be a sufficient consideration." *Robinson v. Kenney*, 526 S.W.2d 115, 119 (Tenn.Ct.App.1973); *see also Dixon v. Manier*, 545 S.W.2d 948, 950 (Tenn.Ct.App.1976). The changes in the new contract provided benefits to both the trustee and to Gibalski. The trustee was able to clear up any problem that might have arisen due to the typographical error in the first agreement's closing date, made the sale subject to 1990 real and personal taxes rather than 1989 real and personal taxes which were to be prorated as of the date of closing, and eliminated the condition that the court hearing which Gibalski was obligated to attend be at a mutually convenient date. Gibalski benefited from the changes in the new agreement since the new agreement expressly provided it was between the trustee, Gibalski or Gibalski's assigns, and the closing date was extended. Since both parties obtained benefits from the modification of the first agreement, the new agreement was supported by sufficient consideration. *See, e.g., Byers Transp. Co. v. Fourth Nat'l Bank and Trust Co.*, 333 F.2d 822, 826 (10th Cir.1964) (mutual advantages and obligations manifest in continued negotiations toward consummation of original contract constituted new and sufficient consideration for agreement to extend closing date).

■ A breach of contract takes place when a party fails to perform according to the agreement. *See, e.g., Hewitt v. Hutter*, 406 F.Supp. at 984; *Hill v. Goodwin*, 722 S.W.2d at 672; *Lawrence v. McCalmont*, 43 U.S. (2 How.) 426, 452, 11 L.Ed. 326 (1844). Gibalski breached the contract by failing to pay the $100,000 deposit which was the first step toward consummation of the sale. "Under Tennessee law, plaintiff is entitled to recover damages for breach of contract if the '... defendant's breach of contract was the direct and proximate cause of the damages which plaintiff has allegedly sustained, without concurring or contributing fault on the part of the plaintiff.'" *Missouri Portland Cement Co. v. J.A. Jones Const. Co.*, 323 F.Supp. 242, 246 (1970), *aff'd sub nom. J.A. Jones Const. Co. v. Englert Eng'g Co.*, 438 F.2d 3 (6th Cir.1971) (quoting *Union Carbide Corp. v. Dunn Bros. Gen. Contractors*, 294 F.Supp. 704, 708 (M.D.Tenn.1968)). As a result of the defendant's failure to perform under the terms of the contract, the sale was not consummated. Gibalski's breach was thus the direct and proximate cause of the trustee's damages.

**820**

"The measure of damages available to the vendor from the breaching vendee in a real estate contract is the difference between the contract price and the fair market value at the time of breach, plus any special damages that arise which are within the reasonable contemplation of both parties when the contract is made." *Turner v. Benson*, 672 S.W.2d 752, 755 (Tenn. 1984). The trustee's damages under the facts of this case total $1,385,000. Hence, the trustee is entitled to receive from the defendant this amount plus prejudgment interest calculated at the rate of 7.7% per annum from January 31, 1990.[1] *See* Tenn. Code Ann. § 47–14–123 (1988); *Polk & Sullivan, Inc. v. United States Gas Co.*, 783 S.W.2d 538 (Tenn.1989); *United Am. Fin. Corp. v. Knoxville Properties (In re United Am. Fin. Corp.)*, 55 B.R. 117, 120 (Bankr.E.D.Tenn.1985).

An order will enter in accordance with this memorandum.

---

1. Pursuant to § 47–14–123 of the Tennessee Code Annotated, the court may award prejudgment interest up to 10%. The court believes that a rate of 7.7% is a fair rate of interest to apply in this case since that figure represents the average rate of interest on a 52–week treasury bill between January, 1990 and March, 1990.