Argued July 1, reversed September 10, petition for rehearing
denied November 4, 1964

## MOHR et ux v. LEAR et al

395 P. 2d 117

*Norman K. Winslow,* Salem, argued the cause and submitted the brief for appellants.

*Otto R. Skopil,* Salem, argued the cause for respondents. On the brief were Williams & Skopil, Salem.

Before McALLISTER, Chief Justice, and ROSSMAN, SLOAN, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendants, six in number, from a decree of the circuit court which canceled a contract and awarded restitution in the amount of $21,421 to the plaintiffs. The latter are Mr. and Mrs.

William Mohr. The defendants are three couples whose family names are Lear, Ranger and Russom.

The defendants present these five assignments of error:

"The trial court erred in holding that the plaintiffs were not in default under the terms of their contract with the defendants."

"The trial court erred in holding that the defendants had repudiated their contract with the plaintiffs."

"The procedural insufficiencies of plaintiffs' case with reference to notice of suit."

"Plaintiffs utter failure to plead, prove, or in fact be willing that the status quo be restored in their suit for rescission."

"The defendants' conduct did not represent a 'total breach' of the agreement, if any, within the rules of rescission and restitution."

The plaintiffs instituted this suit to secure the cancellation of a contract whereby the plaintiffs undertook to purchase from the defendants all of the shares of stock of a corporation entitled Woodburn Lanes, Inc., which operated a bowling alley in Woodburn. The principal issue presented by the appeal is whether the defendants' conduct was of such a character that it can justify a decree of cancellation.

The contract of sale was signed by the parties August 3, 1961. The total price of the shares of stock was $88,000; of that sum $24,000 was rendered payable with the signing of the contract and the remainder of the purchase money was payable in monthly payments of not less than $650 each. The agreement provided that a concern entitled American Escrow, Inc., should (1) act as escrow agent, (2) hold the stock certificates and other documents, (3) collect the money

payable to the escrow agent and make the stipulated disbursements. The contract contained the following provision concerning the sellers' (defendants') rights in case of the buyers' (plaintiffs') default:

"In the event that the Buyers fail to make the payments as required in said agreement and shall continue in default for a period of ten (10) days after such payments are due and payable, then and thereupon, upon the happening of such event, it is agreed that the American Escrow, Inc. shall forthwith return and deliver the certificates of stock, theretofore deposited with it by the Sellers and at the same time pay them all sums remaining in the account set up to handle this agreement. It being specifically agreed that all sums previously paid thereon shall be forfeit to Sellers as and for liquidated damages and payment for the use and depreciation of the corporate assets. Thereafter Sellers shall not be liable to Buyers under the terms of the said agreement in any manner whatsoever."

The plaintiffs assumed operation of Woodburn Lanes on August 5, 1961, and continued to operate the alley until January 26, 1962. The relationship between the parties prior to the commencement of this suit was cordial. In September of 1961 William Ranger, one of the defendants, loaned the plaintiffs $1,000 "to carry him through the summer months." The gross receipts of the business were between $2500 and $3000 per month, yet, as of January 26, 1962, the corporation owed approximately $7000 in current operating expenses.

Sometime prior to January 24, 1962, the defendants became aware that Woodburn Lanes was delinquent in paying its current charges to a concern entitled A.M.F. Pinspotters, Inc., which was the lessor of the machines that Woodburn Lanes used to reset the

bowling pins after a patron had played. January 25, the defendants went to Woodburn and discussed with the plaintiffs the status of the A.M.F. account. In the morning of January 25, the plaintiffs had received a letter from A.M.F. demanding the immediate payment of all delinquencies, namely $3583.10 in rental arrearages, and $74.56 on open account. The letter stated that the account had been transferred to the collection division and that A.M.F. was prepared to resort to its attorney for legal action on the following Monday, January 29. On that day, January 25, the plaintiff, Mr. Mohr, had attempted without success to borrow money in order to meet the A.M.F. charges.

Upon defendants' arrival in Woodburn Lanes Mr. Mohr showed them the letter just mentioned and asked Mr. Ranger and Mr. Lear whether they could lend him the needed money. Mr. Ranger and Mr. Lear were unable to do so. Mr. Mohr then assured the defedants that he would make the necessary arrangements with A.M.F.'s regional representative, and the conference ended on that basis.

That evening the defendants consulted with an attorney in an attempt to ascertain their rights and obligations. The next day, January 26, three of the defendants, Mr. and Mrs. Lear and Mrs. Russom, obtained from Mrs. Hazel Altig, the president of American Escrow, Inc., a copy of the contract of sale, the corporate stock certificates, minute book, and seal which had been lodged with the escrow agent. Then the defendants Lear and Ranger drove to the bowling alley and brought the above instruments with them. Again the A.M.F. delinquency was discussed with Mr. Mohr. The latter related to the defendants the continued frustration of his efforts to borrow money and

his inability to obtain from A.M.F. anything more than an assurance that it would not take any action until Monday, January 29, or on a day beyond then.

At the termination of the conference just described, the defendants resumed operation of the bowling alley and Mr. Mohr made an announcement to that effect over the public address system within the building. The keys to the premises, one of which Mr. Mohr had, were turned over to the defendants on the evening of the 26th. An employee of Mr. Mohr delivered the other key. The following morning the defendants began an inventory, and sometime the following week had negotiated an understanding with A.M.F. whereby the delinquency of the corporation would be liquidated in eight equal installments. A trust account was opened by the defendants in which they deposited the daily receipts from the bowling operations.

During the week following the take over, Mr. Mohr continued to attempt to borrow money with which to refinance the operations. He conferred with A.M.F. by telephone and apparently made an arrangement of his own about the account whereby he could again take over the alley if he secured adequate financing. The plaintiffs also sought legal advice and on February 1, 1962, filed this suit.

Plaintiffs' complaint alleged the making of the contract and incorporated it into the pleading. It averred payment of the down payment and the first five monthly installments. As a basis for relief the plaintiffs alleged that the defendants' repossession of the stock from the escrow agent and their assumption of possession of the premises occurred at a time when the plaintiffs were not in default. The plaintiffs termed the defendants' act a wrongful repudiation of

the contract. The plaintiffs then set forth their election to treat the conduct as a rescission and prayed for cancellation as well as restitution.

The defendants' answer admitted the making of the contract and also the payments, $27,250. It denied all other allegations of the complaint and set forth affirmative defenses. In the first of the latter the defendants alleged that plaintiffs had abandoned the contract and had voluntarily surrendered possession of the premises to the defendants. In their second affirmative defense they alleged that the plaintiffs breached the contract by defaulting in the installment payment due February 1, 1962.

The trial judge found that

"* * * the defendants obtained possession in violation of the terms of the agreement at a time when the plaintiffs were not in default * * *."

and

"* * * there is ample evidence of the breach of the contract by the defendants and that said breach is of the 'total breach' type of conduct giving the plaintiffs their election of remedies. It would be difficult for the Court to imagine a more total breach than the unlawful acquisition of the very subject matter of the contract, i.e., the corporate stocks, plus physical control of the assets and all of the plaintiffs' money. * * *"

Defendants' second and fifth assignments of error raise the controlling issue on this appeal: Whether the defendants' conduct in obtaining the stock certificates, the subject matter of the agreement, and in resuming operation of the bowling alley January 26, 1962, amounted in law to a wrongful repudiation or total breach of the contract.

48

■■  This being an equity proceeding, "This court tries the case de novo and is not bound by the trial court's findings of fact and conclusions of law nor by the legal theory which that court adopted." *Vermeer v. Hickman,* 229 Or 569, 368 P2d 77. On appeal of an equity case the trial judge's findings are entitled to consideration as he had the advantage of being present at the trial and of observing the demeanor of the witnesses; but his findings are not conclusive upon us. ORS 17.440.

■  Both parties to this appeal are in agreement as to the general rules to be applied in determining the consequences to follow from defendants' conduct. Any voluntary affirmative act of a party which renders substantial performance of his contractual duties impossible, or apparently so constitutes a total breach (1 Restatement, Contracts, § 318, p. 475) and warrants a suit seeking cancellation and restitution (2 Restatement, Contracts, § 347, comment e.). However, it is not every slight dereliction of one party to a contract that will entitle the other to abrogate it. "* * * [R]escission is not warranted where the breach is not substantial and does not defeat the objects of the parties. * * *" (*Walton v. Denhart,* 226 Or 254, 262, 359 P2d 890, and cases cited therein.) When one party repudiates a contract or commits a total breach thereof, the injured party has an election to pursue one of three remedies: he may treat the contract as at an end and sue for restitution, he may sue for damages, or he may sue for specific performance in certain cases. *Armsby v. Grays Harbor Commercial Co.,* 62 Or 173, 123 P 32; *Massey v. Becker,* 90 Or 461, 176 P 425; *Cornely v. Campbell,* 95 Or 345, 186 P 563; *Paine v. Meier & Frank Co.,* 146 Or 40, 27 P2d 315; *Macomber v. Waxbom,* 213 Or 412, 325 P2d 253.

■ Defendants' conduct must provide plaintiffs with more than an excuse for or defense to a charge based on their nonperformance; the effect must be so substantial as to operate to discharge plaintiffs from further contractual obligations, *Krebs Hop Co. v. Livesley,* 51 Or 527, 92 P 1084; the defendants' nonperformance must be so material as to justify the injured party in regarding the whole transaction as ended, 4 Corbin, Contracts, § 946, page 809. The conduct must have been motivated by a positive, definite, absolute, unconditional and unequivocal intent evincing a fixed purpose not to perform in any event. Only such acts as these will support a suit or counterclaim based on repudiation or total breach. *Dingley v. Oler,* 117 US 490, 6 Sup Ct 850; *Mobley v. New York Life Ins. Co.,* 295 US 632, 55 Sup Ct 876; *New York Life Ins. Co. v. Viglas,* 297 US 672, 56 Sup Ct 615; *Tovrea v. Alderman,* 211 F Sup 865; *Cornely v. Campbell,* supra; *Ratcliffe v. Union Oil Co. of California,* 159 Or 221, 77 P2d 136; *Swick v. Mueller,* 193 Or 668, 238 P2d 717. *Tovrea v. Alderman,* supra, states:

"* * * To constitute an anticipatory breach of an executory contract, one must refuse to perform one's obligation under the contract 'positively, unconditionally, unequivocally, distinctly and absolutely.' Swick v. Mueller, 193 Or 668, 676, 238 P2d 717, 720 (1952)."

■ The power of an equity court to cancel an instrument is discretionary; it is not one of absolute right, but rests in the discretion of the court, to be exercised in accordance with what is equitable and just under the circumstances. *Reynolds v. Janzen,* 232 Or 548, 376 P2d 415; 3 Black, Rescission and Cancellation, (2nd Ed., 1929) § 644, p. 1556; 9 Am Jur, Cancellation of Instruments, p. 353, § 5. The question gen-

erally presents itself: May the contract be maintained or have the ends it was designed to subserve been effectively frustrated? This question is one of degree; no mechanical formula can consistently be applied with satisfaction or success. "* * * To determine whether a breach avoids the contract as a whole one must consider what is necessary to work out reparation in varying conditions. * * *" *New York Life Ins. Co. v. Viglas,* supra. The law should and does look with disfavor upon precipitate unilateral terminations of contracts by either vendor or purchaser. Lacy, Equity —1959 Oregon Survey, 39 Or L R 14.

Previous decisions by this court are particularly relevant to our inquiry into the fact situation presented by this instant appeal. In *Montgomery v. Heider,* 147 Or 523, 34 P2d 657, plaintiffs had purchased land from the defendants on a conditional sales contract. Plaintiffs sued to recover payments alleging rescission. The defendants answered alleging abandonment and a need to have someone in possession of the premises to prevent lapse of the insurance and a default in the mortgage. The defendants had rented the premises to third parties during the plaintiff's absence. The trial court held for the plaintiffs and we affirmed. The question on appeal was whether the defendants' conduct amounted to a repudiation of the contract. The applicable law was agreed upon and was deemed settled; a vendee where there is a wrongful rescission by the vendor "* * * may elect to assent to such rescission and may maintain a suit or action to recover the moneys paid on such contract. * * *"

In *Morrison v. Kandler,* 215 Or 489, 334 P2d 459, plaintiffs-vendors sued to obtain strict foreclosure of a contract for the sale of a ranch. Purchasers filed

a cross-complaint for cancellation and restitution. This court held that there was "no evidence tending to prove plaintiffs intended to effect a rescission of the contract when they retook possession," and that no action was taken thereafter by them which would have prevented them from performing. The test which the court applied in determining whether there had been a repudiation was whether the vendors' conduct evinced an intention to no longer be bound by their contract. The court held that it did not.

In a similar case, *Nygaard v. Anderson,* 229 Or 323, 366 P2d 899, the court applied the test announced in *Morrison v. Kandler.* Plaintiffs-vendors sought strict foreclosure of a contract to sell a motel. The purchaser cross-claimed for cancellation and restitution. The issue on appeal was whether plaintiffs' repossession amounted to a wrongful repudiation. The opinion suggested that the resumption of possession by the vendors was not ipso facto a wrongful act. Factors evidencing an intent to affirm or disaffirm the contract on the part of the vendors were discussed. The evidence disclosed that the repossession was not intended as a negation of the purchaser's possessory and equitable interest. The vendors were prepared at all times to surrender the property to the purchasers in substantially the same condition as it was when purchasers had vacated it. The vendors were also prepared to account for personal property used during their occupation. In the Nygaard case there was a threatened foreclosure by a mortgagee and we held that where there was no evidence of an intent to repudiate, the vendors' conduct was to be regarded as consistent with an effort to preserve the security and integrity of the transaction by protecting the security interest. "*   *   *   The absence of a provision for

the preservation of the security does not preclude * * * the resumption of possession by the vendor * * * to protect his security in the property. * * *" The court based its statement on an analogy to cases involving land sale contracts where receivers had been appointed.

*Miller v. Barker,* 233 Or 113, 377 P2d 343, is the latest reiteration of the rule announced in *Morrison v. Kandler,* supra. In that case the purchasers sued for cancellation of a contract to buy a motel. The trial court granted a decree for the plaintiffs which was reversed on appeal. We held in that case that repossession and operation by the vendors do not accomplish a forfeiture by themselves. There was no evidence that operation by the vendors infringed upon or precluded any rights of the purchasers.

■ When the principles and standards, as applied in the cases just reviewed, are applied to the case at bar, the result is clear. The plaintiffs have elected their remedy. They have failed however to sustain the burden of proof upon their allegation of a wrongful retaking of the stock certificates and repossession of the bowling alley premises. With due respect for the opinion of the trial judge, we have concluded that whether or not the plaintiffs were in default in any manner, the defendants did not at any time repudiate the contract or otherwise prevent themselves or the plaintiffs from performing it.

The plaintiffs and the defendants, each apparently with legal advice, cooperated with each other in their endeavors to salvage their respective advantages from the precarious transaction. There remained an atmosphere of mutual aid even after the defendants had resumed operations. January 25 the parties came un-

der unusual stress because of the fear of legal action by A.M.F. and perhaps by the Schmids. The only copy of the Mohr contract that was available to the defendants was in the possession of the escrow agent. The attorney from whom the defendants sought counsel asked them to obtain the papers from the escrow agent so that he could render the requested advice. At the time the documents were obtained from American Escrow, Inc., three of the defendants signed an instrument purporting to be a release of the escrow agent from further duties and liability under the contract. The defendants took the contract and other papers to the attorney who had requested to see them. He in turn referred the defendants to a Marion County attorney. The defendants made an effort to see that attorney before his office closed and before they arrived at the bowling alley on the evening of January 26, but failed to do so. It is significant that the plaintiffs did not know of the retaking of the stock and of the signing of the purported "release" until after those events had occurred; yet plaintiffs base their suit for cancellation on the existence of that instrument. There is ample evidence that the sole purpose defendants had in going to American Escrow, Inc., was to obtain the papers for their attorney. We note that the escrow agent made an attempt to have the papers returned to it a few days after the defendants had obtained them. This action on the part of the escrow agent is an indication that the terms of the "release" did not imply its true nature. When all the circumstances surrounding the retaking of the stock certificates are considered and given their proper weight, it is unreasonable to conclude that the defendants thereby manifested their unequivocal intention to no longer be bound by the terms of their contract.

An analysis of the evidence concerning the resumption of control of the bowling alley indicates that that conduct does not amount to a repudiation by the defendants of the contract. Defendants went to Woodburn on January 26 at least in part to participate in their regular bowling activities. The other part of their purpose was to discuss with plaintiffs further suggestions for meeting the A.M.F. obligation. Mr. Ranger finally suggested that for the best interests of the corporation the defendants be allowed to try to save the business. Of course, the defendants were motivated by a desire to protect their own interests when they made the suggestion. The defendants stated that because of their good credit rating they could possibly work out a satisfactory payment schedule with A.M.F. The plaintiffs were not unconditionally dispossessed, for at that time the defendants told Mr. Mohr that if at any time he could borrow the money he could return and take over again. Nor were they barred from their possessory rights, for they appeared at the lanes after the takeover and did some work in the office.

*Nygaard v. Anderson,* supra, is here controlling on the question presented by this appeal. There, as here, the parties were threatened by imminent foreclosure of third party interests. In the Nygaard case the sellers were prepared to account for the fruits of their possession. The defendants here kept the receipts from the bowling operation separate and deposited them in a special trust account established for that purpose. The defendants also kept accurate records of the income and expenses of the business. There is some evidence that the defendants considered that

their repossession of the premises was to be only temporary and that it was taken for the good of the business and those concerned. Defendants were at all times prepared to relinquish possession to the plaintiffs at any time that the latter obtained the needed money. There is ample evidence that the plaintiffs acknowledged this condition and that they continued after January 26 their efforts to obtain funds apparently on such an assumption.

The testimony of the defendants as to their purpose in obtaining the stock certificates was not refuted by plaintiffs. Instead the plantiffs seek to base their case upon an instrument that they have wrenched out of its environment. When the purported "release" is explained in the setting of the facts surrounding its issuance, the distortion relied on by plaintiffs is evident. In context the instrument is in fact not what it purports to be. Another similarity with the Nygaard case should be noted. In that case the sellers had made some apparently damaging statements in their deposition with regard to the issue of their intent to repudiate. When the circumstances were revealed, the statements were equivocal and this court so regarded them. In the case at bar, statements attributed to Mr. Mohr by his employee, Harvey Miles, Jr., and some attributed to defendant Ted Lear by Jack Evans, a friend, might also be considered as indicating an understanding on the part of the plaintiffs that the contract was being repudiated. However, in the light of all the other evidence showing the defendants' intent, these statements cannot be accepted as sufficient to establish an unconditional, positive intent that the contract was no longer binding upon the parties.

The trial court erred in holding that the defend-

ants had repudiated their contract and that their conduct represented a total breach of their obligations. For the above reasons, the decree of the lower court must be reversed and the complaint dismissed.

Reversed.

SLOAN, J., dissenting.
I would affirm the trial court's decree.