Argued·May 8, affirmed as modified with instructions July 13,
petition for rehearing allowed October 25, 1972, re-argued
January 8, reversed and remanded with instructions May 17, 1973

# SHOPPING CENTERS OF AMERICA, INC.,
## *Respondent, v.* STANDARD GROWTH
## PROPERTIES, INC., *Appellant.*

498 P2d 781
509 P2d 1189

*John R. Faust, Jr.,* Portland, argued the cause for appellant. With him on the briefs were Cake, Jaureguy, Hardy, Buttler & McEwen, Portland.

*Francis E. Marsh,* McMinnville, and David C. Haugeberg, McMinnville, argued the cause for respondent. With them on the brief were Marsh, Marsh, Dashney & Cushing, McMinnville.

TONGUE, J.

This is a suit to rescind a contract for the sale of land purchased by plaintiff from defendant. Defendant appeals from a decree allowing rescission and other relief, but denying plaintiff's further de-

mand for damages for increase in the value of the property. Plaintiff cross-appeals from the denial of such damages.

On November 28, 1969, plaintiff, a corporation engaged in land subdivision and development, contracted to purchase 827 acres of land in Yamhill county west of Carlton for $472,898 and as a down payment assigned to defendant another contract which, by its terms, would eventually pay $112,898.

Defendant corporation had previously prepared a printed advertising brochure describing the tract as "827 acres of rich farmland and recreational property" which "should be subdivided into 5-10 acre ranchettes which are in great demand in this area." By February 1970, however, after observing surface water on large portions of the tract, plaintiff decided that only 400 acres were suitable for subdivision. It also concluded, either then or subsequently, that the tract was nevertheless worth the contract price provided that 400 acres (later 307 acres) could be subdivided into smaller tracts and the remainder developed for duck ponds, quail and pheasant hunting, and other recreational purposes.

To accomplish that purpose its attorney then recommended that the land be developed under a condominium plan, with "unit deeds" to the property to be subdivided and with the remaining acreage to be held as "community property." In order to develop the land under such a plan, however, plaintiff's attorney also concluded that the Unit Ownership Law of Oregon, including ORS 91.530, would require that title to the entire tract be held either in fee simple or under lease and that this would make it necessary to modify the "acreage release" provision of the land sale

contract. Under that contract provision defendant agreed to deliver warranty deeds for tracts of one or more acres only upon receiving $750 per acre from plaintiff in part payment of the contract balance. At that time, however, it was apparently contemplated by the parties that most of the 827 acre tract would be subdivided and no specific or different provisions were made for "acreage release" of title to remaining portions of the tract.

On February 16, 1970, plaintiff's attorney prepared a letter setting forth a proposal for a revised acreage release provision under which title to the property would be deeded in escrow by defendant to plaintiff in fee simple and the contract be converted into a security agreement, with a new payment schedule for release of defendant's interest. A meeting of attorneys and other representatives of both parties was then held to discuss the proposal. At that time, although it was agreed that the attorneys for both parties would review the proposal further, defendant's president stated that "It's all right with me, but it's subject to the approval of the board of directors and I will have to take it back to San Francisco and get the final approval there." No response was ever received, however, as to whether the proposal was acceptable or not.

Meanwhile, plaintiff proceeded with a series of meetings with the Yamhill County Planning Commission in an attempt to secure the necessary approval for the proposed subdivision. Representatives of defendant also appeared at these meetings upon behalf of plaintiff's position. Numerous problems were then encountered, including the problem of septic tanks and sewage disposal. Finally, on August 14, 1970, after

much difficulty and effort, plaintiff was able to secure conditional approval of a plan for the subdivision of 307 acres of the tract upon the satisfaction of some further objections. Those conditions were then satisfied by plaintiff.

Plaintiff then requested defendant's approval of that plan and also again requested its approval of the proposed amendments to the lot release provisions of the purchase contract, stating that no sales could be made to the public until the lot release provision had been presented to and approved by the Oregon Real Estate Commissioner. Again, however, no response was received, despite repeated attempts by plaintiff. Finally, nine days before the first annual contract payment of $30,600 was due on November 28, 1970, plaintiff wrote a letter to defendant electing to rescind the contract, based upon the contention that defendant had misrepresented that the entire 827 acres could be subdivided; and that defendant had breached the contract by failing to "cooperate" by approving the plan for subdivision, including "a more feasible release provision," and by failing to deliver a title insurance policy, as required by the contract.

Plaintiff then filed a complaint alleging substantially the same contentions and praying for a decree rescinding the contract, for the refund of its down payment of $112,898 and for judgment in the sum of $437,823.73 (representing the down payment, payment for improvements, and the alleged increase in the value of the tract). The trial court found that plaintiff had not proved misrepresentation or fraud, but had proved a breach of contract, and entered a decree rescinding the contract, requiring the "return to the plaintiff" of "the down payment of $112,898.00" and entering judg-

ment against defendant for various expenses which are not in controversy. The trial court did not, however, allow plaintiff's claim of $250,000 for increase in the value of the property.

Defendant contends on this appeal that the court erred in finding that defendant's conduct was a breach of contract because (1) the "approval clause was incapable of breach by defendant," (2) "delay in acting on the subdivision for approval" was not "shown to be a material breach, justifying rescission," and (3) "defendant's refusal to respond to a request [for] a modification of the contract cannot constitute a breach * * *."

Neither party, in the short briefs submitted by them, has cited any cases or other authorities which directly decide or discuss the legal problems arising from these contentions, as applied to facts similar as those involved in this case, other than general authorities cited by defendant to the effect that the law looks with disfavor upon the unilateral termination of contracts and that rescission is not warranted for breach of contract unless the breach is so substantial as to defeat and frustrate the objects and ends which the contract was designed to serve.[1] For this reason, and because the decision of this case is controlled by its particular facts, we also deem it unnecessary to cite or discuss further cases or other legal authorities.

■ We agree that under ordinary circumstances the failure or refusal of one party to a contract to respond to a request by the other party for a modification of its terms cannot constitute a breach of the contract.

---

[1] Bollenback v. Continental Casualty Co., 243 Or 498, 506, 414 P2d 802 (1966); Mohr v. Lear, 239 Or 41, 49, 395 P2d 117 (1964); Restatement of Contracts § 276.

In this case, however, plaintiff contends that at the time of the original contract the parties were "in error as to the way the property could be developed." This "error" resulted from the fact that both parties apparently assumed at that time that at least 750 acres of the 827 acres could be subdivided in tracts, whereas it later developed that only 307 acres could be subdivided. Plaintiff also contends that the original lot release provision, which was entered into upon the assumption that at least 750 acres could be subdivided, "became unworkable" when it developed that only 307 acres could be subdivided. Thus, plaintiff contends that the contract was rescindable because "the contract was thereby made impossible to perform as represented by defendant and agreed upon by both parties unless modifications could be made in the amount of land to be subdivided and a workable lot release agreement entered into that could obtain the approval of the Real Estate Commissioner."

Defendant does not deny that the original lot release provision became "unworkable" when it later developed that only 307 acres could be subdivided, except to contend that plaintiff did not prove that the lot release provision would not have been approved by the Real Estate Commissioner. Neither does defendant concede that the original contract, including the lot release provision, became "impossible to perform."

It was conceded by both parties on oral argument, however, that a mutual mistake existed at the time of the execution of this contract in that both parties then assumed and understood that most of the entire tract of 827 acres could be subdivided when, in fact, more than one half of the tract was so low that it was not suitable for subdivision and the county

authorities would approve the subdivision of only 307 acres.

Accordingly, upon discovery of that mistake in February 1970, plaintiff would have been entitled to rescind the contract at that time upon the ground of mutual mistake, even under the authorities cited by defendant, provided that the mistake was so material as to frustrate or defeat the purposes of the contract.

Defendant says that there was no "showing" that its withholding of approval frustrated the purposes of this contract and that "there was no showing that the lot release plan executed and in force would not have been approved by the [Real Estate] Commissioner" (presumably under a proposal for condominimum development under the Unit Ownership Law of Oregon, including ORS 91.530), but that "the only showing was that the plan executed was not satisfactory to plaintiff."

■ This, however, is a suit in equity and upon a de novo consideration of the entire record we agree with plaintiff's contention that the original lot release provision, under which defendant would deliver warranty deeds to plaintiff conveying title to tracts of one or more acres only upon payment of $750 per acre, while practical upon the assumption that 750 acres of the 827 acres of the tract could be subdivided and sold in separate parcels, was "unworkable" in its operation and application, as a practical matter, when it subsequently developed that only 307 acres could be subdivided and sold in separate parcels. In our judgment, the mutual mistake relating to the acreage which could be subdivided, when considered in the light of this lot release provision, so frustrated the purposes of the contract for the subdivision and development of the tract as to justify a rescission of the contract.

Indeed, as held in *Mohr v. Lear*, 239 Or 41, 395 P2d 117 (1964), one of the breach of contract cases cited by defendant, at pp 49-50:

> "The power of an equity court to cancel an instrument is discretionary: it is not one of absolute right, but rests in the discretion of the court, to be exercised in accordance with what is equitable and just under the circumstances. *Reynolds v. Janzen*, 232 Or 548, 376 P2d 415; 3 Black, Rescission and Cancellation, (2nd Ed., 1929) § 644, p. 1556; 9 Am Jur, Cancellation of Instruments, p. 353, § 5. The question generally presents itself: May the contract be maintained or have the ends it was designed to subserve been effectively frustrated? This question is one of degree; no mechanical formula can consistently be applied with satisfaction or success. * * *"

It follows, in our judgment, that because of this mutual mistake of the parties, plaintiff was entitled upon discovery of that mistake in February 1970, to rescind the contract unless defendant would agree to some modification of its original lot release provision. The fact that plaintiff continued its efforts to secure defendant's approval of such a modification over a period of several months does not mean that plaintiff was not still entitled to a rescission of the contract in November 1970, after all such efforts had failed. Indeed, defendant makes no contention that plaintiff's right to rescind the contract was barred by failure to act more promptly (as distinguished from defendant's delay in responding). It follows, in our opinion, that the trial court did not err in entering a decree rescinding this land purchase contract.[2]

---

[2] Similarly, the fact that the tract may have been worth the full contract price even if only 307 acres could be subdivided does

Defendant points out that plaintiff did not rely upon a theory of mutual mistake at the time of trial, but proceeded instead upon theories of misrepresentation and breach of contract. It is also true that the trial court based its decision upon a finding that defendant had breached the contract. The question of mistake was discussed by the parties, however, both in their briefs and in oral argument before this court. Indeed, it was conceded at that time that in entering into this contract both parties were acting under the mutual mistake that most of the 827 acre tract could be subdivided and sold in 5-10 acre "ranchettes." It also appears in this case, in which plaintiff did not plead mutual mistake, but did plead the somewhat closely related theory of misrepresentation, that the record is also complete on the issue of mutual mistake, even though not specifically pleaded as such. Cf. *Hanscom v. Irwin*, 186 Or 541, 558-59, 208 P2d 330 (1946).⑧

---

not require a different result under the facts of this case because we are convinced that, as a practical matter, the lot release provision made such a subdivision impractical unless that provision was modified in some manner.

⑧ Defendant also contends that the contract provision in question was "incapable of breach by defendant" because plaintiff could have proceeded with performance without approval by defendant on the theory that defendant, by failing and refusing to answer plaintiff's letters, had waived the contract provision requiring its approval of plans for development of the tract.

The effect of defendant's contention would be to put plaintiff in the position of proceeding at its risk with the development of the property under a plan which defendant had not approved and to accept the possibility that if plaintiff was wrong in assuming a waiver by defendant, the entire purchase contract could be foreclosed by defendant for such a breach by plaintiff. There may have been sufficient evidence of such a waiver of defendant's right to approve the plot plan for development of the 307 acres, as submitted by plaintiff for approval on August 14, 1970, and Octo-

For all of these reasons, and upon a de novo review of the entire record, we hold that plaintiff was entitled to a rescission of the contract.

Defendant also assigns as error the failure of the trial court to "restor(e) the parties to their previous position" in that the decree ordered defendant to "return to the plaintiff the down payment in the sum of $112,898.00." Thus, defendant points out that the down payment was not paid by plaintiff in cash, but by the assignment to defendant of another contract which would eventually pay that amount, and only after a contract payment by defendant of over $75,000.

At the time of trial plaintiff stipulated that "if we get the contract back, why, they get the $75,000 plus whatever paid [in interest]." Plaintiff contends, however, that there was no evidence "that defendant still owned the contract" so as to be able to return it to plaintiff.

Under these circumstances, we hold that the decree of the trial court should be modified so as to provide, in the alternative, that defendant shall reassign that contract to plaintiff if it is able to do so within such reasonable time as may be fixed by the trial court and, if not, that defendant shall pay to plaintiff the sum of $112,898. The decree should also provide that, in either event, defendant is entitled to

ber 8, 1970. There was no evidence, however, that defendant had waived its right to approve plaintiff's proposed amendment of the acreage release provision of the contract. Indeed, the evidence is to the contrary. Moreover, even after plaintiff elected to rescind, defendant informed plaintiff that it would not approve "your proposed * * * development plan," but would perform the original "lot release program."

credit for such payments of principal and interest as may have been made by it under that contract.

Defendant's final assignment of error is that the trial court erred in denying its cross-complaint for foreclosure of the land sale contract because of plaintiff's failure to pay the first annual payment on that contract. Since, however, we have held that the trial court did not err in rescinding the contract, it follows that defendant was not entitled to foreclose it.

■ Plaintiff, by cross-appeal, contends that the trial court erred in not restoring the "status quo" by awarding plaintiff "compensation" in the sum of $250,000 as "the value by which the property was enhanced due to plaintiff's efforts resulting in subdivision approval." In support of that contention plaintiff cites authorities for the proposition that in a suit for rescission of a land sale contract the court may decree an allowance for the value of any permanent and valuable improvements placed upon the land by the vendee.

In this case, however, plaintiff does not seek compensation for any permanent improvements placed upon the land by it. Moreover, as pointed out by defendant, any "enhanced value" based upon the securing of subdivision approval by a county planning commission may perhaps be "lost at the stroke of an administrator's pen" and, in any event, can hardly be considered to be a "permanent improvement" of the land. Indeed, plaintiff also sought (and was awarded) reimbursement for expenses incurred by it in such improvements. Under the circumstances of this case the trial court did not err in denying plaintiff's claim for an additional $250,000 for enhanced value of the land as the result of plaintiff's efforts in obtaining subdivision approval.

The decree of the trial court is affirmed, as modified, with costs to neither party, and the case is remanded for further proceedings consistent with this opinion.

## ON PETITION FOR REHEARING

Suit by purchaser against vendor to rescind a contract for sale of land. The Circuit Court, Yamhill County, Kurt C. Rossman, J., allowed rescission and other relief, but denied purchaser's further demand for damages for increase in value of property, and cross appeals were taken. The Supreme Court, 498 P.2d 781, affirmed as modified and remanded for further proceedings. After a rehearing was granted, the Supreme Court, Denecke, J., held that where it was doubtful whether evidence preponderated to view that vendor was mistaken in any material or substantial way on amount of acreage available for subdivision, though it did preponderate to view that number of acres available for subdivision for homesites did not relate to intrinsic nature of bargain, and no evidence was presented as to how much of property was unsuitable for subdivision, an acreage release plan would have been workable for purchaser had it not changed its ideas on ownership of common area, rescission of contract based on mutual mistake of parties in regard to amount of acreage available for subdivision was not warranted.

Reversed and remanded with instructions.

McAllister, J., concurred in result.

Tongue, J., dissented and filed opinion in which Holman, J., joined.

*John R. Faust, Jr.,* Portland, argued the cause for appellant and cross-respondent. With him on the briefs were Cake, Jaureguy, Hardy, Buttler, McEwen & Weiss, Portland.

*Francis E. Marsh* and *David C. Haugeberg,* Mc-

Minnville, argued the cause for respondent and cross-appellant. With them on the briefs were Marsh, Marsh, Dashney & Cushing, McMinnville. David C. Haugeberg argued the cause for respondent and cross-appellant on rehearing.

DENECKE, J.

We granted a rehearing to reconsider plaintiff's right to rescission of a land sale contract. We affirmed the decree of rescission in our former opinion on the ground that there had been a mutual mistake. The defendant contends that mutual mistake was not an issue in the case and that if it had been it could have introduced additional evidence that no mutual mistake had occurred. Plaintiff answers that mutual mistake was an issue and was proved.

Mr. Bright, president of the plaintiff, acted for the plaintiff in this whole transaction. He was an experienced real estate developer who previously developed property in Hawaii and Alaska. He became acquainted with this property while representing another party interested in exchanging its equity in a shopping center for the property.

Mr. Bright inspected the property and subsequently purchased an adjacent 87 acres. In July 1969 he moved into a home on that land. As he said, "All I had to do was look out the front door and I can see the whole 827 acres." He became interested in developing the 827 acres and negotiated with defendant for its purchase. In November 1969 the parties entered into the contract of purchase.

Plaintiff alleged three grounds for rescission in its complaint—fraudulent representation, innocent mis-

representation and breach of contract. The allegation of misrepresentation stated:

"(a) That in the tract of land, the subject of the sale hereinabove described and which was commonly referred to as Rancho Verde, there was 827 acres of rich farmland and recreational property with a potential of more than 90% return on the invested capital in less than two years.

"(b) That said 827 acres of Rancho Verde as above described could be subdivided into 5-10 acre ranchettes which were in great demand in the area where the Rancho Verde lands were located.

"(c) That the real property described in said contract (Exhibit 'A') attached hereto could be readily subdivided into lots and tracts and was suitable for a subdivision and complied with all the laws of the State of Oregon relating to subdivisions within the state and that similar land had been approved by authorities as subdivided tracts and had consistently sold for from $1,000 to $1,500 an acre.

"* * * * *

"The foregoing representations made to the plaintiff by the defendant were, in fact, at the time made, false and untrue in that said land could not be subdivided and was not rich farmland and recreational property and similar tracts had not been subdivided, and all of said representations at said time were false and untrue."

At trial the principal contentions of misrepresentation were that defendant represented that the property could be subdivided into 5- to 10-acre tracts and the plaintiff should have no trouble getting approval from the county planning authorities for subdividing the property. The evidence was that a brochure published by defendant's agent stated: "With the vast diversity of the land, Rancho Verde should be subdivided into 5-10 acre ranchettes * * *." Plaintiff's president testified defendant's agent told him

there would be no problem getting Planning Commission approval of the use of septic tanks. This was the only evidence of representations by defendant.

Bright testified his original idea was to "cut it up into 150 five-acre tracts" with the remaining area, about 75 acres, to be held in common for duck ponds, horse barns, dog kennels, bird hatcheries, pool and lodge. When the winter rains came Bright saw that "several hundred acres" were under water; so he decided to divide about half the land into 2½-acre tracts and to use the other half for the various improvements and recreational use.

Before Bright signed the contract with defendant, in November, he talked with the County Planning Commission about the proposed development and it had indicated it probably would have no objection, but the plan would be subject to the Health Department's approval. In February 1970 plaintiff had percolation tests run. These tests made it appear that septic tank use was feasible on the portion plaintiff wanted to develop. The County Planning Commission had employed such percolation tests previously to determine the feasibility of using septic tanks. On the basis of the favorable test results in this instance, the commission gave plaintiff tentative approval of the subdivision with 2½-acre tracts on about 400 acres.

Sometime subsequently the Planning Commission was instructed by the State Health Department to consult with the Soil Conservation Service for inquiry into the feasibility of septic tank use. As a result of the Soil Conservation Service's study the area in which septic tanks could be used with the population density desired by plaintiff was reduced an undetermined amount.

In June the Planning Commission tentatively approved the amended proposal of plaintiff. Plaintiff never submitted any final plan to the commission. Plaintiff states that it could not submit any final plan because its contract with defendant required defendant's approval of its subdivision plans and defendant failed to approve.

The trial court, without stating any reasons, found for the defense on the fraud and innocent misrepresentation counts. The plaintiff never has urged at any stage of the appeal that the trial court erred in this respect and we will not further consider misrepresentation.

■ This is a suit in equity to rescind and we, therefore, review de novo. We held that mutual mistake was in issue and found that the parties were mutually mistaken in their belief that 750 acres of the 827 acres could be subdivided and that this mistake "so frustrated the purposes of the contract for the subdivision and development of the tract as to justify a rescission of the contract." After further examination of the puzzling record and further briefs and oral argument we conclude that we were in error and we find that there was not such a mutual mistake as would justify the rescission of the contract.

■ A contract may be rescinded if the parties enter into it through a mutual mistake on their part. Both parties must be mistaken. "[M]istake means a state of mind that is not in accord with the facts." 2 Restatement 958, Contracts § 500. The mistake must be fundamental in character. *Highway Com. v. State Construction Co.*, 203 Or 414, 435, 280 P2d 370 (1955). Stated differently, "Mistake Must Relate to Fundamental Assumption. It is often said that a mistake, in order to justify rescission, must relate to the intrinsic nature

of the bargain * * *." 13 Williston, Contracts (3d ed) 94, § 1544.

The only evidence that defendant entered into the contract in a mistaken belief about the number of acres that could be subdivided was a statement in the brochure of the realtor representing defendant, which was: "With the vast diversity of the land, Rancho Verde should be subdivided into 5-10 acre ranchettes * * *." We said in our opinion that defendant conceded at oral argument "that a mutual mistake existed * * * in that both parties * * * assumed and understood that most of the entire tract of 827 acres could be subdivided when, in fact, more than one half of the tract was so low that it was not suitable for subdivision." 498 P2d at 784-785. But counsel for defendant merely said that the parties "contemplated" they could subdivide more lots than they actually could. It is doubtful whether the evidence preponderates to the view that defendant was mistaken in any material or substantial way on the amount of acreage available for subdivision.

More important, we find the evidence preponderates to the view that the number of acres available for subdivision for homesites did not relate to "the intrinsic nature of the bargain." Off hand, this seems like a specious observation, but we believe it is correct as it relates to this particular property and plaintiff's plan for development.

The plaintiff did not testify that the property was worth less because it had less space for homesites than Bright had originally anticipated. When Bright bought the property the evidence is that he contemplated selling 5-10 acre homesites and having about 77 acres as a community area with horse barns, riding stable, duck lakes, swimming pool, lodge, etc. When he

saw in the winter that more land was water soaked than he anticipated he changed the details of his plan but not the basic concept. He testified: "* * * [S]o, I didn't change the concept of Palomino Farms a bit, I just decided to do the recreational areas in spades; instead of four duck ponds, let's dig up five or ten duck ponds * * *." Instead of proposing that each homesite owner fulfill his urge for open space by having 5 to 10 acres surround the house and the use of a few acres in common with his neighbors, plaintiff was going to accomplish the same purpose by drastically reducing the size of the homesites but drastically increasing the size of the common area.

Bright liked the changed development better than the original. He testified: "We still felt it saleable, ultimately; the quality of the product we were going to merchandise was better than the original idea." He reiterated that the final plan using only 307 acres for homesites "actually made it a more attractive and more marketable product."

We were also bolstered in reaching a decision that there was a mutual mistake by the belief stated in our opinion that more than half the tract was not suitable for subdivision and the county authorities would approve the subdivision of only 307 acres. Upon further examination of the entire record we find our belief was not completely correct. There is no evidence how much of the property was water soaked in the winter. Mr. Bright testified "several hundred acres of this land had a water table sitting on top of the ground." The engineer engaged by plaintiff was not asked to determine how much land would be flooded by surface water.

The Planning Commission approved substantially more than 307 acres for homesites using septic tanks,

although, in some of these areas a density of one family per 10 acres was required. However, Mr. Bright by this time had decided he wanted to concentrate the homesites and have roughly 500 acres as a recreational area.

We were also of the opinion initially that a mutual mistake of the amount of acreage available for homesites was material because it rendered the acreage provision of the contract unworkable and frustrated the purpose of the contract. Further dissection of the problem convinces us we were mistaken.

Plaintiff was purchasing the 827 acres by contract. To provide security to the defendant-seller but to grant the fee of the homesite to its purchasers, the plaintiff proposed an acreage release provision in the contract which was acceptable to defendant. Under the provision, when the plaintiff sold a parcel, plaintiff would pay $750 per acre to the defendant and the defendant would deliver a deed for this parcel. The payments to defendant would be credited on the balance of the purchase price. The principal balance was $360,000 and the sale of slightly less than 500 acres would pay the balance.

With the plaintiff now going to sell homesites on only 307 acres, $750 per acre would produce substantially less than $360,000. When we considered the problem after argument on rehearing we were troubled to determine how reducing the number of acres to be sold for homesites and thereby reducing the acreage release payment was prejudicial to the plaintiff. It appears that the defendant would be the party who had cause for complaint. All the homesites would be sold and the plaintiff would still owe a substantial balance on the principal. It now appears that plaintiff's reason

for seeking a new acreage release provision was that plaintiff changed its concept of ownership of the common area.

The acreage release provision proposed by plaintiff and adopted in the contract provided that when defendant had been paid $100,000 on the principal it would convey the common area, referred to as the "community area," to plaintiff.

In February 1970 plaintiff's attorney suggested a complete change in the security to be accorded defendant when plaintiff sold tracts. Instead of the acreage release provision already described, the attorney suggested defendant convey the entire 827 acres to plaintiff and rely upon other devices for security. A purchaser from plaintiff would receive not only title to his building site, but also an undivided interest in the common area. The development would be a condominium; that is, under "unit ownership." ORS 91.505 et seq. The attorney estimated these units would sell for $10,000.

This apparently was unacceptable to defendant. In plaintiff's last demand on defendant to modify the contractual release provision, plaintiff dropped the request that the defendant convey the entire 827 acres and accept some other security. However, plaintiff continued to propose that when it made a sale and paid a portion of the price to defendant, defendant would convey not only the building site sold, but an undivided interest in the common area. When defendant rejected plaintiff's proposed plan it stated: "The plan as submitted is not acceptable to us primarily because in our opinion it would result in impairing our security interests due to the excessive utilization contained in the plan for common areas."

If plaintiff had not changed its ideas on ownership of the common area the original lot release plan would not have been unworkable for plaintiff although it would have furnished much less security for defendant. Plaintiff would ultimately have sold 307 acres for homesites and paid defendant $750 per acre, a total of about $230,000, with $130,000 remaining owing on the principal.

We conclude that we were in error in our original decision and that there was no mutual mistake justifying a rescission of the contract.

The trial court decreed rescission upon the ground that the defendant had breached the contract by refusing to approve the plans for subdivision and this was a ground for rescission. The contention of the plaintiff on appeal was that the trial court was correct in this assessment of the facts. The defendant contended, in essence, that there was no breach of the contract because all plans submitted for defendant's approval included a proposed modification of the contract and it is not a breach of contract to refuse to modify an existing contract.

We did not decide this issue in our original decision. We now conclude that the defendant did not breach the contract.

The "Acreage Release Provisions" of the contract provided, in part: "Purchaser agrees to submit in writing to Vendor for its written consent and approval all plans and specifications in connection with subdividing, partitioning or otherwise developing for recreational or residential purposes or otherwise the property * * * it being understood that such submission and approval shall be prior to purchaser's offering said property for sale."

The plaintiff submitted to the defendant for approval the plan the Planning Commission had tentatively approved, along with a proposed amended acreage release provision. Defendant did not respond until its rejection crossed in the mail with plaintiff's demand for rescission. Defendant stated in its rejection letter: "2. This will confirm our rejection of your prior requests for modifications or amendments of the above captioned lot release program contained in said contract."

■ We find the evidence is clear that an integral and essential part of the plan submitted to defendant for approval was a change in the acreage release provision of the contract and that approval of the subdivision plan alone, without also consenting to a change in the contract, would have been of no value to plaintiff. Plaintiff argued exactly that and stated in its brief: "To separate the lot release provisions from the subdivision plans would be to completely ignore the realities of subdivision and the requirements and provisions of the contract."

Plaintiff admits that ordinarily the refusal of a party to a contract to agree to an amendment is not a breach of contract. It contends here, however, that defendant had an obligation to agree to a modification because the contract was "based upon defendant's representations." Plaintiff argued in its brief on petition for rehearing that it was entitled to relief from the lot release provision because such provision was agreed to because of mutual mistake.

We have already explained we will not review the trial court's dismissal of the fraud and misrepresentation counts since plaintiff has not claimed the ruling was incorrect. We have found that the parties

did not enter the contract because of a mistake of any fundamental character. Therefore, this case is not an exception to the rule that a party is entitled to stand on its contract as written.

Plaintiff also contended defendant breached the contract by failing to furnish title insurance as provided by contract:

"Vendor shall furnish at his expense a Purchaser's title insurance policy in the amount of $475,000.00 within ten days from the date hereof insuring Purchaser against loss or damage sustained by him by reason of the unmarketability of Vendor's title, or liens or encumbrances thereon, excepting matters contained in usual printed exceptions in such title insurance policies and further excepting liens and encumbrances of record as of the date hereof."

The facts are that the policy was ordered on a date unknown. The policy was not mailed by the title company until December 3, 1970. It bears the effective date of December 31, 1969, which is the date when the contract between the parties was recorded. Title policies are usually issued as of the date of the recording of the contract. A preliminary report had been issued at an unspecified time. When the contract was recorded the title examiner noted that the description in the contract and, therefore, that to be inserted in the policy, omitted a reference to two section numbers and, accordingly, it was incomplete. The title examiner suggested that the description in the contract be completed in this regard, the contract recorded, and then the description in the policy be completed. Nothing was ever done and the policy issued has the incomplete description.

A breach of contract in order to substantiate a

rescission must be substantial. "Rescission is not warranted when the breach is not substantial and does not defeat the objects of the parties." *Bollenback v. Continental Casualty Co.*, 243 Or 498, 506, 414 P2d 802 (1966). The failure to furnish a title policy within 10 days or to furnish one with a complete description is not a substantial breach defeating the objects of the parties.

The decree of the trial court is reversed. The defendant counterclaimed for foreclosure because plaintiff had not made the payment due on the contract. The suit is remanded for the trial court to enter a decree in accordance with this opinion and enter a decree deciding the issue raised by defendant's counterclaim for foreclosure.

McALLISTER, J., concurs in the result.

TONGUE, J., dissenting.

I respectfully dissent for the same reasons as stated in my original opinion in this case.

HOLMAN, J., joins in this dissent.