Argued May 4, affirmed November 16, 1972

KOCH, *Appellant, v.* SKY TECH, INC. ET AL, *Respondents.*

NEWMAN ET AL, *Appellants, v.* SKY TECH, INC. ET AL, *Respondents.*

502 P2d 1367

*Paul R. Meyer,* Portland, argued the cause for appellants.

*John Henry Hingson III,* Oregon City, argued the cause for respondents.

BRYSON, J.

Plaintiff Koch entered into a contract with the defendant Sky Tech, Inc., to purchase a Piper Cherokee airplane with a concurrent lease-back agreement. Approximately three months later Mr. Koch and his son-in-law, plaintiff Newman, jointly executed similar

agreements with defendant Sky Tech to purchase and lease back a more sophisticated twin-motored Piper Comanche airplane. Plaintiffs became dissatisfied and filed separate suits in equity seeking rescission of the contracts, alleging material misrepresentations and substantial breach of contract. The cases were con- solidated for trial. The plaintiffs appeal from separate decrees in favor of defendants.

Defendant Sky Tech sells and rents airplanes. Defendant Clarke is president of and salesman for Sky Tech. Plaintiff Koch is a general contractor and home builder. Plaintiff Newman is an electrical contractor. Mr. Koch's son, an airplane pilot, was employed by Sky Tech.

In the summer of 1970 the son suggested to his father, plaintiff Koch, that he meet with defendant Clarke to discuss the purchase and lease-back of a Piper Cherokee airplane. Mr. Koch, his son, and Mr. Clarke attended the meeting. Mr. Clarke proposed that Sky Tech would sell the airplane to Koch and lease it back for use in its rental and flight instruction business. The proposal was to have certain investment, depreciation, and tax benefits to the purchaser and purchaser was to have the use of the airplane at a reduced rate by notifying Sky Tech one week in advance of this intention, specifying the date, time, and period involved.

Clarke presented a "purchase agreement," "rental agreement," and "aircraft schedule" for Koch's consideration. The purchase agreement described the airplane and equipment and set forth the purchase price and down payment. The rental agreement provided: the terms by which Sky Tech rented the plane

from plaintiff Koch, including the hourly rate; payment by Sky Tech for all fuel, washing, waxing, tie down, landing and hangar fees; payment of insurance by owner Koch and schedule of rental when used by Koch. It further provided that "either party may terminate this agreement by giving notice to the other." The aircraft schedule showed a breakdown cost for operating the airplane of $7.15 per hour based on 1,000 flight hours per year and a "monthly outlook" of expenses and income based on 80 flight hours per month, showing a monthly average net income of $124. Koch and Sky Tech executed the purchase money agreement on August 24, 1970, and the rental agreement on August 30, 1970. Mr. Koch's son went to the factory in Florida and picked up the airplane.

Plaintiff Newman learned of his father-in-law's purchase and lease-back of an airplane. On Newman's inquiry, Clarke presented similar purchase and rental agreements and an aircraft schedule to Mr. Newman on a more sophisticated twin-motored Piper Comanche airplane. Newman was unable to interest his corporate business associates in the advantages of buying an airplane for their company under a purchase-lease-back plan. However, his father-in-law, plaintiff Koch, joined with him in the purchase and lease-back of the twin Piper Comanche airplane. Clarke, Newman, and Koch met on November 10, 1970, to discuss the proposal regarding the Comanche airplane. This "aircraft schedule" presented by Clarke showed a cost for operating the Comanche airplane of $14.90 per hour based on 600 flight hours per year, and the "monthly outlook" of expenses and income based on 50 flight hours per month showed a monthly loss of $37.44. This rental agreement provided that either party could terminate

the agreement by giving one year's notice to the other party.

On September 27, 1971, the trial court entered decrees in favor of defendants. Plaintiffs filed their appeal in each case on October 26, 1971. On November 19, 1971, the Comanche aircraft was lost while on a flight from California to Oregon, and application was made to the insurance carrier for the amount of the insurance coverage, $27,500. Plaintiffs filed their briefs in this appeal on January 15, 1972. On February 1, 1972, the insurance company issued its draft to plaintiff, Sky Tech, and the First National Bank of Oregon, Newberg Branch, the holder of a security interest in the Comanche aircraft. By correspondence, plaintiffs' attorney suggested that the insurance proceeds be used to satisfy the bank's security interest and that the excess sum be paid to plaintiffs. Defendants' attorney answered by letter of February 3, 1972, and agreed that the insurance proceeds belonged to the plaintiffs and that Sky Tech, Inc., would endorse the draft. Twenty-one thousand seven hundred twenty-seven dollars and two cents was paid to the bank and the remaining $5,772.98 was paid to the plaintiffs. Defendants filed their briefs in this appeal on February 26, 1972, and made no reference or objection to this disposition of the insurance proceeds.

On April 28, 1972, defendants filed a motion, addressed to both cases, to dismiss the appeal on the grounds that "plaintiffs have accepted the benefits of the decree from which they appeal and have exercised rights and engaged in acts which amount to asserting elements of ownership of the subject matter of the contract subsequent to the trial of this case by receiving, collecting, endorsing, and depositing the insurance

company's settlement for the total loss of the Comanche aircraft * * *." This motion was filed just seven days before the date of oral argument on appeal and we elected, pursuant to Rule 4.25 of our Rules of Procedure, to dispose of the motion by court opinion.

## ON MOTION TO DISMISS APPEAL

Although defendants' motion to dismiss the appeal is addressed to both cases on appeal, it could only apply to the case of the destroyed Comanche aircraft, *Harold L. Newman and George N. Koch v. Sky Tech, Inc., et al.*

Defendants' motion first contends "that plaintiffs have accepted the benefits of the decree from which they appeal," relying on *Wilson v. Wilson*, 242 Or 201, 407 P2d 898 (1965). The decree in *Wilson* awarded plaintiff-respondent a divorce and custody of the minor children and awarded defendant-appellant the sum of $1,500, to be paid in monthly installments of $100 each. The record disclosed that defendant-appellant accepted $100 monthly payments as provided in the decree. We dismissed the appeal as to the settlement awarded, stating, "a litigant will not be permitted to appeal from a judgment or decree the benefits of which he has accepted."

■ In the case at bar, the decree was to dismiss plaintiffs' suit. No theory is apparent, and defendants have suggested none under which a decree of dismissal may carry benefits, the acceptance of which would bar appeal.

## ON THE MERITS

Plaintiffs assign as error the trial court's failure to "decree rescission for material misrepresentations

made by defendants to induce plaintiffs to enter into two aircraft purchase-leaseback agreements and to award plaintiffs restitution and other equitable relief."

The plaintiffs contend that the aircraft schedules presented by Clarke constituted express warranties and that the statements in the schedules projecting operation costs, flight hours and income were misrepresentations that induced plaintiffs to enter into the purchase and lease-back agreements.

The defendants contend, and the trial court found, that the statements in the schedules were mere opinions and not representations or warranties given to induce plaintiffs to enter into the transactions.

■ Of course, under some circumstances, a manifestation of opinion by a seller when relied on by a purchaser can constitute a material misrepresentation sufficient to support an avoidance of the agreement by the purchaser. 2 Restatement, Contracts 902, § 474, Comments *a.* and *b.* The plaintiffs rely on such cases as *Pope v. Hays,* 244 Or 136, 416 P2d 325 (1966); *Furtado v. Gemmell,* 242 Or 177, 408 P2d 733 (1965); *Brown v. Hassenstab,* 212 Or 246, 319 P2d 929 (1957). Each of these cases involved the sale of a business where the seller had operated the business for some time and made certain representations as to gross receipts and net income. They can be distinguished on the facts from the case at bar. Here, Clarke, although expert in the aircraft leasing field, gave his opinion as to projected costs, flight hours and income in the future, not as to past performance of an existing business. He testified that a number of factors, such as poor weather, financial arrangements, and a depressed state of economy or the plaintiffs' decision to terminate the lease-back agreement could alter the future

income figures. The evidence also shows that Clarke had no experience in the leasing of larger planes, such as the twin-motored Piper Comanche aircraft. As stated in Comment *b* to 2 Restatement, Contracts § 474, this "frequently involves a difficult question of interpretation to determine whether a manifestation is merely an expression of opinion." However, in this case we need not decide if the projected figures in the aircraft schedules were material misrepresentations.

■ In January, 1971, the plaintiffs met with Clarke and complained as to the method of computing the hours of plane rental. Hobbs hour meters had been installed in each plane, in addition to the tachometer. The Hobbs meter registers hours of use from the time the master switch is turned on or the oil pressure is activated. The tachometer hour meter registers one hour for one hour of operation of the motor at 2,300 revolutions per minute. Sky Tech billed those renting the planes on the basis of the Hobbs hour meter reading and paid the plaintiffs based on the tachometer hour reading. The Hobbs meter reading registered a higher number of operating hours. Plaintiffs also complained of a $10.20 charge for installing the Hobbs hour meter, a $41 charge for damage to one tire and charges for oil changes, all arising out of the interpretation of the lease-back agreement. On February 2, 1971, plaintiffs wrote Clarke and Sky Tech regarding these complaints and stated,

"* * * This is our understanding of the agreement, and until we are convinced that it indicates otherwise, we expect it to be adhered to.

"* * * * *.

"Larry, George and I entered this agreement with you in good faith and intend to fulfill our obligations to it. We feel, though, that Sky-Tech is not

fulfilling its obligations to us, or should I say 'is maximizing in its behalf'. We particularly want the situation regarding the hourly rate resolved and a written answer from you immediately stating your position so that we, George and I, can act accordingly.

"* * * * *

"/s/    H. Lew Newman"

On February 7, 1971, Clarke wrote Newman in reply to his letter of February 2 and agreed to pay Koch and Newman on the basis of the Hobbs hour meter and to adjust all previous remittances to reflect the Hobbs hour meter reading rather than the tachometer hour reading. The charge for the installation of the Hobbs meter and the charge for the tire were voided but no agreement was reached concerning charges for oil changes. Clarke affirmed the lease-back agreement stating, "Lew, I would like to point out that we to [sic] entered into this agreement under good faith and intend to fulfill our obligations." By further telephone conversations and meetings, both parties expressed a desire to rectify any points of disagreement. Shortly thereafter, plaintiffs notified Sky Tech of their election to rescind the purchase-lease-back agreement. There is no evidence that plaintiffs acquired further knowledge or claimed additional misrepresentations on the part of Sky Tech between the time of their meetings and letters and the date plaintiffs gave notice of rescission. These acts, as disclosed by the evidence, constitute an affirmance of the agreements between the parties and prevent a subsequent avoidance. Restatement, Restitution 274, § 68(1).

"The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepresentation mani-

fests to the other party to the transaction an intention to affirm it, * * *." 2 Restatement, Contracts 924, § 484.

In *Brown v. Hassenstab, supra* at page 256, we stated, "[w]hen one discovers that fraud or misrepresentation induced him to enter into a contract, he has an election either to continue the obligation or to disaffirm it. The two courses of action are inconsistent and the taking of one will preclude the other * * *" and explained that the election to affirm the contract can be manifest by "any act indicating an intention to abide by the contract * * *."

In the case at bar the evidence indicates that upon discovery of what may or may not have been grounds for rescission, Newman and Koch, by word and act, indicated their desire to enforce the contract. Their subsequent letters of rescission were ineffective because they had full knowledge of the claimed misrepresentations at the time of their affirmance.

Plaintiffs also assign as error the failure of the trial court to decree rescission by reason of material breach by defendants of their obligations under the lease-back agreement.

■ In order to justify the rescission of a contract, a breach thereof must touch the fundamental purposes of the contract. "[Rescission] is not permitted for a slight, casual, or technical breach, but, as a general rule, only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." 12 Williston on Contracts 188 (3d Ed 1970). *See also, Bollenback v. Continental Casualty Co.,* 243 Or 498, 414 P2d 802 (1966); *Mohr v. Lear,* 239 Or 41, 395 P2d 117 (1964).

■ The trial court found that plaintiffs failed to prove a material breach of contract which would justify rescission. We agree with this finding. The remaining points of disagreement concerning oil changes and fluctuating premiums for insurance do not appear to be such fundamental breaches as would defeat the entire object of the parties in entering into the contracts.

Affirmed.