Argued July 9, affirmed November 12, 1976

HAY et ux, *Appellants,*
*v.*
PACIFIC TASTEE FREEZ, INC. et al,
*Respondents.*

555 P2d 1256

*Robert L. Burns,* Gresham, argued the cause and filed briefs for appellants.

*Robert J. Miller,* Portland, argued the cause for respondents. With him on the brief were Black, Kendall, Tremaine, Boothe & Higgins.

Before Denecke, Chief Justice, and McAllister, Holman and Howell, Justices.

McALLISTER, J.

## McALLISTER, J.

The plaintiffs, Mr. and Mrs. Arthur D. Hay, brought this suit for rescission of a franchise agreement entered into with the defendant Pacific Tastee Freez, Inc. The defendant, Harold H. McMurray, was a vice president of Tastee Freez in charge of its operations in Oregon. After a trial the court found for defendants and entered a decree dismissing plaintiffs' suit. Plaintiffs have appealed.

The principal issues are (1) whether defendants misrepresented the business to plaintiffs; (2) whether plaintiffs promptly sought rescission after learning of the alleged misrepresentations; and (3) whether the Franchise Act, ORS Chapter 650, which became effective October 5, 1973, applies to this case.

Plaintiffs came to the United States from England in 1957. Hay worked as a salesman and sales manager for American Greetings Company for nine and one-half years. Before moving to Oregon plaintiffs operated two businesses in California, an office supply business, which they operated from 1966 until 1969, and a franchised "Tijuana Taco" restaurant in Novato, California, which they operated from 1969 until 1971. These businesses were successful and plaintiffs sold the taco restaurant for a good profit.

Plaintiffs moved to Oregon in 1971 and began looking for a franchised hamburger, French fry and milkshake restaurant to purchase, believing that this type of operation would be more suitable for the Oregon market than a taco restaurant. While they studied the market in the Portland area Hay took a job as a salesman with Levitz Furniture Company, where his salary was $35,000 a year.

Plaintiffs first contacted defendant McMurray in June 1972 to inquire about a Tastee Freez restaurant under construction at the corner of Milwaukie and Powell Boulevards in Portland. However, the Hays decided that they did not like the building design of

that particular restaurant. In June 1973 they again contacted McMurray to inquire about the Parkrose Tastee Freez, which was then under construction. They met with McMurray on numerous occasions before deciding to purchase the Parkrose franchise.

In their original complaint plaintiffs alleged that defendants made the following misrepresentations to them:

> "1. That plaintiffs could reasonably expect a gross annual sales of $140,000.00, and could reasonably expect a net return of from 12% to 14% on gross sales, and that plaintiffs' food and paper costs would not be in excess of 40% of gross sales. In truth and in fact, plaintiffs' gross, through the time of filing this Complaint, projected on an annual basis, will not be in excess of $96,000.00 per annum. That plaintiffs have experienced a net loss of 12.3% of the gross sales, without computation of a salary for manager, and plaintiffs' food and paper costs have been 53.3% of gross sales."

The above portion of plaintiffs' original complaint was repeated verbatim in plaintiffs' amended complaint.

Plaintiffs also alleged in both complaints other misrepresentations of lesser importance, but since those other representations are not referred to in plaintiffs' brief and because of our holding that plaintiffs did not timely elect to rescind, we need not delineate the other alleged misrepresentations in this opinion.

Plaintiffs made their own independent investigation of the Parkrose location by conducting traffic counts and studies of the neighborhood and competition. They visited the Tastee Freez restaurants in Cedar Mill and at other locations to observe their volume of business. Their decision to purchase the Parkrose franchise was based in part at least on information obtained from this investigation, from their past experience in the restaurant business, from a study of trade publications and from a comparison of business volume done by McDonald restaurants.

[ 572 ]

On July 16, 1973 plaintiffs paid $2,000 as a deposit on the Parkrose franchise. On September 18, 1973 they paid an additional sum of $13,000 and signed a note for $5,000 to make up the remainder of the franchise fee. The $20,000 franchise fee covered good will, use of the Tastee Freez name, and logo and the right to operate the store at the Parkrose location for a ten-year period. The franchise agreement provided that plaintiffs were to make monthly payments to Tastee Freez for rental on the premises and equipment. Plaintiffs were also obligated under the agreement to pay all real and personal property taxes.

Plaintiffs took possession of the Parkrose Tastee Freez and opened for business on September 19, 1973 before the written agreement had been completed. Tastee Freez could not compute the exact amount of monthly rental payments until it received invoices from suppliers for installation of some of the equipment.

Plaintiffs began experiencing difficulties as soon as the restaurant opened. Neither plaintiffs nor their employees were trained by Tastee Freez until the store actually opened its doors, which led to much confusion. The operator's manual supplied by Tastee Freez was outdated and incomplete. Some of the equipment began malfunctioning immediately and needed to be continually repaired and finally replaced.

Plaintiffs were so discouraged by the opening that on September 20 they tried unsuccessfully to stop payment on their September 18 check. That same day they asked McMurray to take the store back, which Tastee Freez declined to do.

McMurray completed the written agreement towards the end of September and gave it to plaintiffs to sign and suggested that they have a lawyer review the agreement for them. Plaintiffs testified that, although they no longer wanted to operate the store they felt they were committed to sign the agreement. They were afraid of being sued for the remaining 10

years' rent. Contrary to McMurray's advice, they did not consult an attorney.

The testimony is in conflict as to whether plaintiffs signed the agreement on October 1, 5, or 8. The contract was then mailed to the defendants' office in California where it was signed on October 9, 1973.

Throughout the fall of 1973 plaintiffs complained to McMurray about the low volume of sales, the rising costs of food and the lack of profit. They had to invest personal savings into the business to cover expenses of operation. Plaintiffs continued to ask McMurray to take the store back or to help them find a buyer for it. However, they did not complain on those occasions of any misrepresentation or fraud. Instead, they told McMurray that the business was interfering with their home life, that they were frustrated with the continual breakdown of the machinery, that they were losing money. McMurray continually reassured plaintiffs that it was winter time, that the business was seasonal, and that summer would be better.

Plaintiffs first sought legal advice in late December 1973. In January 1974 their attorney contacted the securities examiner for the Oregon Corporation Division about possible violations of the Franchise Act by Tastee Freez.

During the five and one-half months that plaintiffs operated the restaurant they experienced gross sales of $39,784.29, food and paper costs of 52.09% of gross sales and a net loss of $9,541.35. They projected that their gross sales would have been under $100,000 had they stayed in business an entire year. In making this projection they anticipated higher sales during the summer months.

The plaintiffs testified that they learned the true facts about the alleged misrepresentations soon after they began business. Mr. Hay's deposition taken

before trial was read into the record at trial. He testified as follows:

"QUESTION: All right. When did you first discover that you couldn't reasonably expect $140,000 gross?

"ANSWER: I think that was quite evident from the start.

"QUESTION: From what, September 20, 21, thereabouts?

"ANSWER: Right from the start, the first day.

"QUESTION: When did you first discover that you wouldn't make 12 to 14 per cent gross?

"ANSWER: At the end of the first, I believe at about the end of about 30 days or at the end of the first period when we had a P & L [profit and loss statement]. We knew when we were drawing money out of our savings and we weren't making it, without even waiting for accountant's P & L.

"QUESTION: When did you discover that your food and paper costs would exceed 40 per cent?

"ANSWER: Almost immediately.

"QUESTION: In September?

"ANSWER: I would say almost immediately, yes.

"QUESTION: 19th, 20th, 21st of September?

"ANSWER: Well, I would say toward the end of the month, and that when those bills started to come in, we couldn't believe it. And then the price increases were going up. We would have some items go up three and four times in a two-month period."

On or about December 13, 1973 McMurray prepared an addendum to the franchise agreement which increased the equipment rental and decreased the building rental. Both plaintiffs signed the addendum and returned it to McMurray on December 28, 1973. Plaintiffs made no mention of any claim of misrepresentation or ground for rescission at that time.

The plaintiffs and the defendants agreed in a writing dated March 1, 1974 that the plaintiffs could vacate the Parkrose Tastee Freez premises and Tastee Freez released the plaintiffs from any obligation to pay rent on the building or equipment or to maintain the premises after that date.

[ 575 ]

Plaintiffs contend that defendants' attorney made a judicial admission in the trial court that entitled them to rescind their agreement and also entitled them to restitution and that the defendants should be bound by those statements.

In his opening statement to the trial court, counsel for the defendants advised the court that such an agreement had been made and that because the plaintiffs had agreed to pay $20,000 for the 10-year franchise and had used it for only five months before the March 1st agreement was made Tastee Freez recognized an obligation to refund the unused portion of the franchise fee. Counsel for the defendants advised the court that such an obligation to refund a portion of the franchise fee had nothing to do with the subject matter of this suit. According to defendants this suit concerns only questions related to the plaintiffs' alleged right to a rescission on the grounds of fraud, misrepresentation and material breach of contract.

Defendants also stated in their brief in this court as follows:

> "The franchise agreement had a ten year term. The franchise fee was $20,000.00. The defendant recognizes that the plaintiffs are entitled to a refund of the unused portion of the franchise fee because they only operated the business for five months. Defense counsel so advised the court in his opening statement. Defense counsel stated that such a claim for a refund of a portion of the franchise fee would be on the theory of *quantum meruit* or money had and received, but that is not involved in this case. * * * This case is for rescission upon the ground of alleged fraud and breach of contract. Any other rights that the plaintiffs may have, whether admitted by the defendant or not, are immaterial."

We agree with defendants that their statement is not a judicial admission affecting this lawsuit. We also agree with them that this suit concerns only questions related to a rescission based on the alleged grounds of fraud, misrepresentation, and material breach of con-

[ 576 ]

tract, so that this decree does not preclude plaintiffs' right to recover the unused portion of their franchise fee and any damages resulting from the conduct of the defendants prior to March 1, 1974.

■ We agree with the trial court that plaintiffs, by their own evidence, established that "all of the alleged misrepresentations, whether active or by concealment, had been discovered by them within the first three weeks from September 19, 1973 on. They conceded that some of them (with respect to employee training and new machinery) were known at the outset of the operation of the business."

Plaintiffs not only signed the franchise contract after they knew of some, if not all, of the alleged misrepresentations, but also on about December 28, 1973 both plaintiffs signed the addendum to the franchise agreement.

It is apparent that from the beginning plaintiffs were not happy with the operation and repeatedly asked McMurray to take the franchise back or help them to sell it. Plaintiffs did not raise with McMurray or with any other representative of Tastee Freez any claim of misrepresentation or ground for rescission at that time. The first defendants knew of plaintiffs' claim of misrepresentation was on January 22, 1974 when McMurray met with an investigator for the corporation commissioner whom plaintiffs had asked to investigate possible violations of the Franchise Act.

On February 4th plaintiffs' attorney wrote Tastee Freez alleging misrepresentations and demanding a rescission of the franchise agreement. This suit was filed on February 21, 1974.

As stated above, the parties on March 1, 1974 signed an agreement pursuant to which Tastee Freez took back the franchise and relieved plaintiffs of further obligations under the contract.

We need not determine whether any statements made to plaintiffs were material misrepresentations

or whether plaintiff relied on them because we find that if there were misrepresentations plaintiff did not rescind promptly.

Since *Scott v. Walton,* 32 Or 460, 52 P 180 (1898) this court has uniformly held that:

> "A party who has been induced to enter into a contract by fraud, has, upon its discovery, an election of remedies. He may either affirm the contract, and sue for damages, or disaffirm it, and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent, but wholly inconsistent. The adoption of one is the exclusion of the other. If he desires to rescind, he must act promptly, and return or offer to return what he has recieved under the contract. He cannot retain the fruits of the contract awaiting future developments to determine whether it will be more profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, will be evidence of his intention to abide by the contract: * * *." 32 Or at 464.

See, also, *Brown et ux v. Hassenstab et ux,* 212 Or 246, 319 P2d 929 (1957); and *Ross v. Carlyle et ux,* 216 Or 576, 339 P2d 1114 (1959), and cases cited therein.

■ Plaintiffs argue that the Franchise Act, ORS Chapter 650, which took effect on October 5, 1973 applies to this case. Without deciding whether that act changed in any way the common law of rescission, we hold that it does not apply to this case. After plaintiffs signed the franchise agreement in early October 1973 it was mailed to California where defendants' president signed it on October 9. Plaintiffs contend that there was no agreement until the contract had been completely executed. On the other hand, defendants contend that the agreement became effective on September 19, 1973 when plaintiffs took possession of the premises and started operating it after completing the financial portion of the transaction on the previous day.

■■ Whether a contract becomes effective when signed or at an earlier time depends upon the intent of the parties. *Wagner v. Rainier Mfg. Co.,* 230 Or 531, 539, 371 P2d 74 (1962); *Western Bank v. Morrill,* 245 Or 47, 57, 420 P2d 119 (1966). An oral agreement is made enforceable under the statute of frauds by a writing authenticating the existence and terms of the contract, even though the writing was prepared and signed after the making of the contract. See 2 Corbin on Contracts §503 (1950); 1 Restatement of Contracts §214 (1932); *Puffer v. Badley,* 92 Or 360, 364, 181 P 1 (1919).

We hold that it was the intention of the parties that the franchise agreement become effective on September 19, 1973 when the plaintiffs moved into the premises and began operation of the business. The preparation and signing of the agreement was delayed pending receipt of invoices for installation of certain equipment, which costs were necessary to determine the exact monthly rental. Under these circumstances the Franchise Act does not apply.

■■ In addition to alleging misrepresentation, plaintiffs also alleged three breaches of contract as a basis for rescission. In order to justify rescission breaches of the contract must be substantial, so as to defeat the purpose of the contract. *Shop. Centers v. Stand. Growth Prop.,* 265 Or 405, 429-430, 498 P2d 781, 509 P2d 1189 (1973); *Koch/Newman v. Sky Tech, Inc.,* 263 Or 425, 434-435, 502 P2d 1367 (1972). We agree with the trial court that proof of the allegations that defendants failed to adequately train plaintiffs and their employees, failed to supervise the operation to correct defects and keep operating costs down, and failed to supervise the operation to increase volume or lower food costs, was insufficient to justify the remedy of rescission even if the attempt to rescind had been timely made.

The decree of the court below is affirmed.